**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| LINDA TOTH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 09-1692 |
| | ) | Judge Nora Barry Fischer |
| CALIFORNIA UNIVERSITY OF | ) | |
| PENNSYLVANIA, ANGELO | ) | |
| ARMENTI, and SEAN MADDEN, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

### I.   Introduction

This matter comes before the Court on cross-motions for summary judgment filed by the

parties pursuant to Federal Rule of Civil Procedure 56.  Docket Nos. 47 & 49.  For the reasons

that follow, the Plaintiff's motion for partial summary judgment (Docket No. 47) will be denied,

and the Defendants' motion for summary judgment (Docket No. 49) will be granted, in part and

denied, in part.

### II.   Background

California University of Pennsylvania ("California" or "the University") is a post-

secondary educational institution existing within Pennsylvania's State System of Higher

Education ("the System").  24 PA. STAT. § 20-2002-A(a)(2).  Angelo Armenti ("Armenti") has

served as the University's President since 1992.  Docket Nos. 50 & 65 at ¶ 17.  Sean Madden

("Madden") started teaching at the University in 1989.  *Id.* at ¶ 20.  He became the Acting Dean

of the University's College of Liberal Arts in July 2006.  *Id.* at ¶ 21.  Donald J. Thompson

("Thompson"), the University's Provost, retired in January 2007.  *Id.* at ¶¶ 17-18.  After

Thompson retired, Armenti selected Madden to serve as the University's Interim Provost. *Id.* at ¶ 22. Laura Tuennerman-Kaplan ("Tuennerman-Kaplan") became the Interim Dean of the College of Liberal Arts and assumed Madden's prior duties. *Id.* at ¶ 34. Madden became the Provost and Vice-President of Academic Affairs in October 2007. *Id.* at ¶ 23.

Linda Toth ("Toth"), a female of Polish descent, is a graduate of the University. Docket Nos. 68 & 75 at ¶¶ 2-3. She holds a doctorate degree in psychology. *Id.* at ¶ 6. In 1990, Toth was hired by the University as an Assistant Professor of Psychology. *Id.* at ¶ 4. She was awarded tenure in 2003 and later promoted to the position of Associate Professor of Psychology retroactive to the fall of 2002. *Id.* at ¶¶ 5-6. The Association of Pennsylvania State College and University Faculties ("APSCUF") serves as the union for the faculty members teaching within the System. Toth served as the Vice-President of the APSCUF's California chapter from 2002 to 2006. *Id.* at ¶ 7. She became the first female President of the chapter in May 2006 and held that position until May 2010. *Id.* at ¶¶ 8-10.

California's University-Wide Promotion Committee ("UWPC") consists of faculty members charged with the duty to review the applications and dossiers submitted by faculty members who are seeking promotions. Docket Nos. 50 & 65 at ¶ 28. The members of the UWPC are elected by the University's faculty. *Id.* Only one professor from a particular department can serve on the UWPC at a given time. *Id.* Barbara Hess ("Hess"), a mathematics professor, served as the Chairperson of the UWPC during the 2005/2006 promotion cycle. *Id.* at ¶ 29. She was succeeded by Robert Kane ("Kane"), a health sciences professor, who served as the UWPC's Chairman during the 2006/2007 promotion cycle. *Id.* at ¶ 30.

The collective bargaining agreement ("CBA") between the System and the APSCUF that was in effect from July 1, 2003 to June 30, 2007, required applications from professors seeking

promotions to be submitted to the "appropriate department chairperson[s]" in the first instance. Docket No. 70-12 at 21. Each application had to be considered by a "departmental committee" before it was presented to the UWPC. *Id.* The relevant portion of the CBA required the appropriate Dean or department chairperson to submit a "detailed recommendation" to the UWPC concerning a professor's application for promotion by February 1 of the year of the promotion cycle. *Id.* A copy of the "detailed recommendation" was to be forwarded to the applicant as well, who had until February 15 to submit a written response to the UWPC. *Id.* The Provost was required to submit a recommendation to the UWPC by February 21, and the applicant was given until March 1 to respond to that recommendation. *Id.* The CBA directed the UWPC to forward the full list of applicants, along with its recommendation concerning each application, to the President (or the President's designee) by April 15. *Id.* at 22. Each applicant was afforded the right to appear before the UWPC and speak in favor of his or her application. *Id.* Promotions approved by the President were to be announced no later than July 15. *Id.*

During the fall of 2005, Toth applied for a promotion to the position of Full Professor of Psychology. ECF Nos. 50 & 65 at ¶ 41. As the Acting Dean of the College of Liberal Arts, Madden was responsible for reviewing Toth's application and making a recommendation. *Id.* at ¶ 42. In a letter to Hess dated January 27, 2006, Madden made several positive statements about Toth but did not specifically make a recommendation concerning her application. Docket No. 51-3 at 29-30.

Six professors applied for promotions to the position of Full Professor during the fall of 2005. They were Aref Al-Kattar ("Al-Kattar"), John Nass ("Nass"), Ellen Michael ("Michael"), LeeRoy Black ("Black"), Mark DeHainaut ("DeHainaut") and Toth. *Id.* at 43. In letters dated January 13, 2006, Madden expressed the view that Al-Kattar and Black were qualified for the

sought-after promotions.  *Id.* at 31-34.  Madden specifically recommended Nass for promotion in a letter dated January 24, 2006.  *Id.* at 35-36.

The UWPC scored each applicant on an 80-point scale.  Docket No. 51-4 at 11.  A minimum score of 50 was needed for a positive recommendation.  Docket No. 51-3 at 43.  The UWPC awarded Al-Kattar a score of 70.1, Nass a score of 66.67, Michael a score of 63.8, Toth a score of 57.78, Black a score of 55.31, and DeHainaut a score of 47.56.  *Id.*  In a memorandum to Thompson dated March 28, 2006, the UWPC recommended that Al-Kattar, Nass, Michael, Toth and Black be promoted.  *Id.*  DeHainaut was not recommended for promotion because his score was lower than 50.  *Id.*

Thompson reviewed the recommendations and computed the percentage of the available points awarded to each applicant.  Because Toth had been awarded 57.78 of the 80 points available on the scale, Thompson rounded her percentile score to 72%.  *Id.*  He ultimately decided against recommending the promotion of any applicant who had not received a percentile score of at least 80%.  Docket No. 51-4 at 11.  In accordance with this standard, Thompson recommended that only Al-Kattar, Nass and Michael be promoted to the position of Full Professor.  Docket No. 51-3 at 43.  In a memorandum to the UWPC dated July 11, 2006, Thompson stated that the remaining applicants had "serious shortcomings" in the areas of "service" and "scholarship."  Docket No. 51-5 at 39.  On July 14, 2006, Armenti announced that Al-Kattar, Nass and Michael had been approved for promotion.  Docket No. 51-3 at 44.  The applications submitted by Toth, Black and DeHainaut were denied.  *Id.*  Toth responded on July 23, 2006, by initiating the grievance procedures that were available to her under the CBA. Docket No. 51-4 at 24.

4

On June 14, 2006, Madden emailed Toth a message inviting her to "a nice informal chat over coffee." Docket No. 51-2 at 38. The message made reference to the fact that Madden and Toth were "going to be working closely on issues more and more in the future." *Id.* Madden again invited Toth to meet "for a cup of coffee" in a message sent on August 9, 2006. *Id.* at 37. Toth apparently never responded to Madden's invitations. Madden sent Toth another message inviting her to meet for "a cup of coffee" on August 17, 2006, suggesting that the two of them needed to discuss union-related issues. *Id.* at 39-40. In an attempt to portray himself as a reasonable person to deal with, Madden declared, "I don't have a strong allegiance to either management or union." *Id.* at 40. Later that day, Toth replied to Madden's invitation with a message stating that she did not "have a spare minute to 'hang out' with anyone in a non-work-related fashion." *Id.* at 39. Toth concluded her message by stating as follows:

> So to sum it up, if you are requesting a professional meeting, let me know when and where. To not meet with you at your request would be insubordination. Other than that, I prefer that our contact remain at the formal, professional level.

*Id.* Madden did not respond to Toth's message. Docket Nos. 68 & 75 at ¶ 29.

Toth submitted another application for promotion to the position of Full Professor of Psychology on September 6, 2006. Docket No. 51-4 at 63-67. Thompson retired in January 2007, and Madden became the Interim Provost. Docket Nos. 50 & 65 at ¶¶ 19, 22. Tuennerman-Kaplan became the Interim Dean of the College of Liberal Arts. *Id.* at ¶ 34. By that time, Kane had become the Chairman of the UWPC. *Id.* at ¶ 30. In a letter to Kane dated January 29, 2007, Tuennerman-Kaplan acknowledged that Toth was "on track for promotion from Associate Professor to Full Professor in the area of teaching." Docket No. 51-5 at 2. Tuennerman-Kaplan went on to state, however, that she had "some concerns" about the breadth of Toth's "involvement in the areas of scholarship and contributions to the University and/or

5

Community." *Id.*  On February 2, 2007, Toth sent a letter to Kane and his colleagues on the UWPC pointing out that Tuennerman-Kaplan had not made a specific recommendation as to whether she should be promoted.  *Id.* at 3.  In her letter, Toth mentioned that she had already filed a grievance pertaining to Madden's failure to make a recommendation during the previous promotion cycle.  *Id.*  She also questioned whether Tuennerman-Kaplan had the requisite experience and qualifications to evaluate her application in a reliable manner.  *Id.* at 3-4.

The University's chapter of the APSCUF published a newsletter in March 2007.  Docket No. 70-9 at 36-50.  The newsletter contained a statement from Toth criticizing Judy Hample ("Hample"), the System's Chancellor, for failing to increase the pay and hiring of faculty members at the same rate as she had increased the pay and hiring of managers.  *Id.* at 36-38.  At the conclusion of Toth's statement was a cartoon lampooning the System's administration and management for retaining increased revenues that were attributable to the increased productivity of faculty members.  *Id.* at 38.  On March 3, 2007, Madden emailed Toth a message stating as follows:

> Among whatever other important points you may have been trying to make in your recent newsletter, I must admit that your effort was lost on me as a result of the tasteless and personal charicature [sic] attack on the chancellor.  I don't deny that there are serious issue [sic] out there and that tensions are heightened because it is a negotiation year, but I fail to see any value or civility at all in dragging this to a personal and insulting level.
>
> I was a member of APSCUF for 17 years and I am ashamed and embarassed [sic] that the organization would lower itself to this kind of tactic.  I can see absolutely no purpose or redeeming value in belittling a person, regardless of opposing viewpoints.  We are a great university with great faculty in a great system of higher education and I do not think this attack is worthy of us.
>
> I assure you that no matter how much you and I may disagree on any subject, that you will never, ever, be subject to such a classless tactic by me.  Just my personal opinion.

Docket No. 51-4 at 60.  The date of Madden's responsive message suggests that the newsletter was published very early in March 2007.

Joseph Zisk ("Zisk"), Mary O'Connor ("O'Connor"), Mary Ann Salotti ("Salotti"), Syvia Barksdale ("Barksdale"), Patricia Milford ("Milford"), Hess, DeHainaut and Toth all applied for promotions to the position of Full Professor during the 2006/2007 promotion cycle.  All eight applicants were awarded scores above the designated minimum score of 50.  Docket No. 70-7 at 16.  Toth received a score of 56.5, which placed her fifth among the eight applicants.  *Id.*  The UWPC recommended that Zisk, O'Connor, Salotti, Barksdale, Hess, DeHainaut and Toth be promoted.  *Id.*  The vote in favor of recommending Toth's promotion was unanimous among the UWPC's nine voting members.  *Id.*  The UWPC's recommendations were relayed to Madden in a memorandum dated April 9, 2007.  *Id.*

On May 1, 2007, Madden emailed Toth a message inviting her to participate in a "pie-throwing" fundraiser designed to raise money for scholarships available to non-traditional students.  Docket No. 51-4 at 61-62.  The fundraiser was scheduled for May 3, 2007.  *Id.*  Toth ultimately accepted the invitation and attended the event.  Docket Nos. 68 & 75 at ¶ 32.  After arriving for the fundraiser, Toth paid for a pie and threw it in Madden's face.  *Id.*  Madden responded by hugging Toth tightly and smearing pie cream on her face, hair, neck and chest.  *Id.* at ¶¶ 33-34.  After that incident, Toth immediately left the event and went home.  *Id.* at ¶ 41.

On May 22, 2007, Toth forwarded Madden's email message of August 17, 2006, to Armenti and called his attention to the sentence reading, "I don't have a strong allegiance to either management or union."  Docket No. 51-2 at 42.  She explained to Armenti that she would "definitely watch [her] back" if she had Madden as her "second in command."  *Id.*  In a subsequent message emailed to Armenti on May 26, 2007, Toth pointed out that the members of

the UWPC had unanimously recommended that she be promoted.  Docket No. 51-2 at 4.

Referring to her earlier grievance concerning the 2005/2006 promotion cycle, Toth stated that the

matter had already been "voted to arbitration" and would eventually end up on Armenti's desk.

*Id.*  Three days later, Armenti responded to Toth's message by stating that he had delegated the

task of deciding who should be promoted to the Provost several years earlier.  *Id.*  He also opined

that the grievance process concerning the denial of Toth's prior application should be left to

proceed without his interference.  *Id.*

On July 10, 2007, Madden sent Armenti a memorandum recommending that Zisk,

O'Connor, Salotti and Barksdale be promoted to the position of Full Professor.  Docket No. 70-7

at 18.  Milford, Hess, DeHainaut and Toth were not recommended for promotion.  *Id.*  That same

day, Armenti sent Toth a letter informing her that her application had been denied.  *Id.* at 20.

Toth was encouraged to meet with Madden or Tuennerman-Kaplan to discuss ways that she

could "strengthen" her "future applications for promotion."  *Id.*  Toth met with Armenti on July

20, 2007, to discuss the situation.  Docket Nos. 68 & 75 at ¶ 110.  The matter remained

unresolved.  Shortly after the meeting, Toth emailed Armenti a message stating as follows:

> As promised, here are the updated local promotion guidelines.  It is odd that your
> provost doesn't have a copy of the guidelines, being that he made such serious
> decisions involving people's lives without them.  It is too bad for all of us that
> you chose Plan B over Plan A.  If you want to reconsider Plan A, I'm still open to
> negotiations.

Docket No. 51-2 at 3.  Toth initiated the grievance procedures available to her under the CBA on

July 23, 2007.  Docket No. 51-4 at 24.

Toth filed a verified questionnaire with the Pennsylvania Human Relations Commission

("PHRC") on August 23, 2007, alleging that she had been subjected to discrimination because of

her sex and national origin, and that the University had retaliated against her for complaining

8

about acts of discrimination perpetrated against other women.  Docket Nos. 68 & 75 at ¶ 143.
On November 9, 2007, Toth filed a charge of discrimination with the Equal Employment
Opportunity Commission ("EEOC").  Docket No. 70-7 at 25-28.  In her EEOC charge, Toth
alleged that her requests for promotion had been denied for discriminatory and retaliatory
reasons.  Docket No. 70-7 at 25-28.  She also claimed that Armenti had harassed her during the
meeting conducted on July 20, 2007.  *Id.* at 26-27.  In the sixth, seventh and eighth paragraphs of
her EEOC charge, Toth stated as follows:

> 6.    I met with President Amenti on July 20, 2007, to discuss the
> recommended candidates for promotion who had been arbitrarily and
> capriciously passed over for the 2006 promotion cycle, while a number of
> candidates with lower rankings assigned by the University-Wide
> Promotion Committee had been promoted, and in doing so I also objected
> to my not having been promoted; in this meeting, I was acting on my own
> behalf, and also in my capacity as President of the California chapter of
> our teachers' union, the Association of Pennsylvania State College and
> University Faculties (APSCUF).
>
> 7.    In such meeting of July 20, 2007, Dr. Armenti had me sit close to him, and
> then he asked me to give him my hand, which he held and stroked; I
> repeatedly pulled my hand back, indicating that I did not want him to hold
> and stroke my hand, but he persisted in attempting to hold and stroke my
> hand, saying, "Give me your hand, Linda," and he indicated that he knew I
> wanted to be promoted, and he promised me I would be promoted; I
> continued to pull my hand away, until he finally stopped, after a
> substantial number of minutes had elapsed.
>
> 8.    Dr. Armenti's insistence upon holding and stroking my hand demeaned
> and humiliated me; he had not held the hand or stroked the hand of the
> two Union Presidents prior to me, both males, and I allege that he did not
> have a practice of holding the hands and stroking the hands of male
> professors who met with him; his behavior was offensive and unwelcome.

*Id.*  After learning of Toth's EEOC charge on November 27, 2007, Armenti emailed a message
to Hample stating that it would be an "understatement" to call Toth's allegation of sexual

harassment a "total fabrication." *Id.* at 29. He further declared, "I will fight and defeat this lie with all the energy I possess." *Id.*

The University refuted Toth's allegations in a position statement filed with the EEOC on February 7, 2008. Docket No. 51-5 at 23-32. In the position statement, the University asserted that Armenti had a firm policy of leaving the door to his office open, and having an administrative assistant at a nearby desk, whenever he was meeting with a female professor, staff member or student. *Id.* at 29. The position statement described the encounter between Toth and Armenti as follows:

> Complainant arrived on time and was ushered into the conference room. She sat in a chair of her choosing—she was not told where to sit. She sat at the conference room table to the immediate left of President Armenti, who sat at the head of the table. Complainant reviewed her "Plan A" settlement proposal. After listening carefully to her "Plan A" proposal, President Armenti calmly stated that he was unwilling to sign the document or approve the Complainant's demand for immediate promotion to full professor because he thought her "remedy" for what had been a minor technical violation of the collective bargaining agreement (Sean Madden's letter to the chair of the promotion committee should have gone out on a Friday, not a Monday since the required collective bargaining date in 2007 happened to fall on the weekend) was disproportionate to the infraction. He calmly told her that he doubted that an arbitrator would impose such a stern penalty and that he would prefer to take his chances by letting any grievance process proceed normally to arbitration, if APSCUF so chose. The Complainant suddenly became extremely agitated and angry and said, in a loud voice, "You are so stubborn!" President Armenti was so startled by the outburst and sudden change in Complainant's demeanor that, in a fatherly effort to calm the Complainant, he placed his hand on top of her hand and told her, "Linda, this is not personal." He asked her to calm down. He did not stroke her hand either slightly or repeatedly.
>
> While keeping control of the document with both hands, Complainant then showed President Armenti certain portions of a document which she referred to as "Plan B," but which she did not leave with him. It was stapled and contained about ten pages and from what he could see, it appeared to have contained a letter from the Complainant to her attorney and a grievance against President Armenti. After reading several items which she pointed out for him with great emphasis from a long list contained in the "Plan B" document and concluding that the purpose of revealing "Plan B" was to coerce the President into promoting her, President Armenti stood up and said "this meeting is over." Complainant refused to leave and was still in her seat when the participants for the next meeting

entered the conference room.  When she rose to leave Complainant said to
President Armenti: "I'll see you in court."

*Id.* at 29-30.  Armenti supplemented the University's position statement with a letter to Joel S.

Pretz ("Pretz"), the EEOC's Alternative Dispute Resolution Coordinator, detailing his efforts to

end sexual harassment and promote opportunities for women on campus.  Docket No. 70-7 at 30-

33.

Toth's grievances were eventually consolidated.  Docket No. 51-4 at 24.  Hearings were

held before Ira F. Jaffe ("Jaffe"), an impartial arbitrator, on December 12, 2008, and February

19, 2009.  *Id.* at 2.  In a decision dated July 20, 2009, Jaffe determined that the conduct of

Thompson and Madden during the two promotion cycles had failed to comport with the

requirements of the CBA.  *Id.* at 1-67.  Armenti was directed to reconsider both of Toth's

applications for promotion without giving consideration to the prior determinations made by

Thompson and Madden.  *Id.* at 54.  He was further ordered to discuss the matter with the

members of the UWPC before issuing a final decision in the event that he opted to reject their

recommendation that Toth be promoted.  *Id.*  On September 28, 2009, the EEOC dismissed

Toth's charge of discrimination and provided her with notice of her right to sue the University on

her own behalf.[1]  Docket No. 51-2 at 43-44.

In a letter to Hess dated December 1, 2009, Armenti stated that he had decided to reject

the UWPC's recommendation that Toth be promoted during the 2005/2006 promotion cycle.

Docket No. 51-5 at 57.  Armenti discussed the matter with Hess and her colleagues on the

UWPC during a meeting conducted on December 14, 2009.  Docket No. 51-16 at 6-9; Docket

Nos. 68 & 75 at ¶ 178.  Later that day, Armenti sent Toth a letter stating that he had denied her

2005/2006 promotion application.  Docket No. 70-10 at 4.

---

[1] 42 U.S.C. § 2000e-5(f)(1).

Toth commenced this action against the University, Armenti and Madden on December 24, 2009, alleging violations of the First and Fourteenth Amendments to the United States Constitution, Title VII of the Civil Rights Act of 1964 ("Title VII") [42 U.S.C. § 2000e *et seq.*], Title IX of the Education Amendments of 1972 ("Title IX") [20 U.S.C. § 1681 *et seq.*], the Rehabilitation Act of 1973 ("Rehabilitation Act") [29 U.S.C. § 701 *et seq.*], and the Pennsylvania Human Relations Act ("PHRA") [43 PA. STAT. § 951 *et seq.*].[2]  Docket No. 1.  On December 31, 2009, Armenti reviewed Toth's 2006/2007 application for promotion and decided to deny it.  Docket No. 51-5 at 58; Docket Nos. 68 & 75 at ¶ 189.  He discussed his decision with Kane and the other members of the UWPC during a meeting conducted on January 25, 2010.  Docket No. 51-16 at 9-10; Docket Nos. 68 & 75 at ¶ 193.  In a letter dated January 26, 2010, Armenti informed Toth that her 2006/2007 promotion application had been denied.  Docket No. 70-10 at 5.

On April 5, 2010, Toth amended her complaint and added allegations pertaining to Armenti's most recent decisions denying her applications for promotion.  Docket No. 10 at ¶¶ 38-48.  A supplemental hearing was held before Jaffe on January 25, 2011, to facilitate a determination as to whether Armenti's decisions denying Toth's applications had constituted violations of the CBA and Jaffe's decision of July 20, 2009.  Docket No. 51-16 at 4.  In a decision dated April 22, 2011, Jaffe determined that Armenti's decisions had been rendered in conformity with the CBA and the previous decision.  *Id.* at 24.

The Defendants filed a motion for summary judgment on June 16, 2011, seeking the dismissal of all claims asserted by Toth.  Docket No. 49.  Toth filed a motion for partial summary judgment that same day, seeking an order requiring her promotion and a determination

---

[2] This case was initially referred to Magistrate Judge Amy Reynolds Hay pursuant to 28 U.S.C. § 636(b)(1).  Chief Judge Gary L. Lancaster referred the case back to the undersigned judge after Magistrate Judge Hay passed away.

that the Defendants had violated the anti-retaliation provisions of Title VII and the PHRA.

Docket Nos. 47 & 47-1.  The cross-motions for summary judgment filed by the parties are the

subject of this memorandum opinion.

## III.   <u>Standard of Review</u>

Summary judgment may only be granted where the moving party shows that there is no

genuine dispute as to any material fact, and that a judgment as a matter of law is warranted.  FED.

R. CIV. P. 56(a).  Pursuant to Federal Rule of Civil Procedure 56, the Court must enter summary

judgment against a party who fails to make a showing sufficient to establish an element essential

to his or her case, and on which he or she will bear the burden of proof at trial.  *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  In evaluating the evidence,

the Court must interpret the facts in the light most favorable to the nonmoving party, drawing all

reasonable inferences in his or her favor.  *Watson v. Abington Township*, 478 F.3d 144, 147 (3d

Cir. 2007).  The burden is initially on the moving party to demonstrate that the evidence

contained in the record does not create a genuine issue of material fact.  *Conoshenti v. Public*

*Service Electric & Gas Co.*, 364 F.3d 135, 140 (3d Cir. 2004).  A dispute is "genuine" if the

evidence is such that a reasonable trier of fact could render a finding in favor of the nonmoving

party.  *McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005).  Where the nonmoving party will

bear the burden of proof at trial, the moving party may meet its burden by showing that the

admissible evidence contained in the record would be insufficient to carry the nonmoving party's

burden of proof.  *Celotex Corp.*, 477 U.S. at 322.  Once the moving party satisfies its burden, the

burden shifts to the nonmoving party, who must go beyond his or her pleadings and designate

specific facts by the use of affidavits, depositions, admissions or answers to interrogatories

showing that there is a genuine issue of material fact for trial.  *Id.* at 324.  The nonmoving party

13

cannot defeat a well-supported motion for summary judgment by simply reasserting unsupported factual allegations contained in his or her pleadings. *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989).

## IV.   Discussion

The Defendants move for summary judgment with respect to all of Toth's claims. Docket No. 49.  Toth moves for summary judgment with respect to her retaliation claims under Title VII and the PHRA.  Docket Nos. 47 & 47-1.  She also seeks an order requiring the University to promote her to the position of Full Professor of Psychology.  *Id.*

Toth's first amended complaint contains a retaliation claim under the Rehabilitation Act stemming from her alleged opposition to discrimination perpetrated by the University against disabled members of its faculty.  Docket No. 10 at ¶¶ 143-148.  In her brief in opposition to the Defendants' motion for summary judgment, Toth consents to the dismissal of that claim.  Docket No. 67 at 2, n. 1.  Therefore, the Defendants' motion for summary judgment will be granted with respect to Toth's Rehabilitation Act claim.  Docket No. 10 at ¶¶ 143-148.

### A.      The *Quid Pro Quo* and "Hostile Work Environment" Claims

Title VII's anti-discrimination provision is codified at 42 U.S.C. § 2000e-2(a), which provides:

> **§ 2000e-2.  Unlawful employment practices**
> **(a) Employer practices.**  It shall be an unlawful employment practice for an employer—
>> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
>> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a).  The University is an "employer" within the meaning of Title VII.[3]  42

U.S.C. § 2000e(b).  Toth is an "employee" entitled to statutory protection.  42 U.S.C. § 2000e(f).

The PHRA declares it to be an "unlawful discriminatory practice" "[f]or any employer

because of the race, color, religious creed, ancestry, age, sex, national origin or non-job related

handicap or disability . . . to refuse to hire or employ or contract with, or to bar or to discharge

from employment such individual or independent contractor, or to otherwise discriminate against

such individual or independent contractor with respect to compensation, hire, tenure, terms,

conditions or privileges of employment or contract, if the individual or independent contractor is

the best able and most competent to perform the services required."  43 PA. STAT. § 955(a).

Although the PHRA is a statute of independent force under Pennsylvania law, its proscriptions

have generally been construed to be coextensive with their federal counterparts.  *Kelly v. Drexel

University*, 94 F.3d 102, 105 (3d Cir. 1996).  In this vein, the provisions of the PHRA are

typically construed to be coterminous with parallel federal anti-discrimination statutes unless a

difference in the applicable statutory language indicates that a different construction is

warranted.  *Fogleman v. Mercy Hospital*, 283 F.3d 561, 567 (3d Cir. 2002).

Individual employees may not be held liable under Title VII.  *Kachmar v. Sungard Data

Systems, Inc.*, 109 F.3d 173, 184 (3d Cir. 1997).  The PHRA, however, expressly makes it

unlawful "[f]or any *person*, employer, employment agency, labor organization or *employe* [sic],

to aid, abet, incite, compel or coerce the doing of any act declared . . . to be an unlawful

---

[3] Title VII defines the term "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such person . . . ."  42 U.S.C. § 2000e(b).  The term "person" is defined broadly enough to include "governments" and "governmental agencies."  42 U.S.C. § 2000e(a).  Because Congress has abrogated the States' Eleventh Amendment immunity in actions brought under Title VII, the University cannot rely on the Eleventh Amendment to defeat Toth's Title VII claims.  *Fitzpatrick v. Bitzer*, 427 U.S. 445, 451-457, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976).

discriminatory practice . . ., or to attempt, directly or indirectly, to commit any act declared . . . to

be an unlawful discriminatory practice." 43 PA. STAT. § 955(e)(emphasis added).  For this

reason, there are circumstances in which an individual may be held liable under the PHRA even

though he or she may not be held liable under Title VII.  *Dici v. Commonwealth of Pennsylvania*,

91 F.3d 542, 552-553 (3d Cir. 1996).

     A discriminatory alteration of one's "terms, conditions, or privileges" of employment

occurs whenever a tangible employment action is taken against an employee because of his or

her refusal to comply with a supervisor's sexual demands.  *Pergine v. Penmark Management*

*Co.*, 314 F.Supp.2d 486, 491, n. 9 (E.D.Pa. 2004).  In any case involving a supervisor's sexual

interest in a subordinate employee, it is reasonable to infer that Title VII's sex-based

"discrimination" criterion is satisfied.  As the United States Supreme Court observed in *Oncale*

*v. Sundower Offshore Services*, 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998), a

heterosexual supervisor will ordinarily direct sexual advances only to members of the opposite

sex.  A tangible employment action taken against an employee who resists the sexual advances

of his or her supervisor constitutes an alteration in the "terms, conditions, or privileges" of his or

her employment.  *Llampallas v. Mini-Circuits, Inc.*, 163 F.3d 1236, 1247 (11th Cir. 1998).

     In *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 63-69, 106 S.Ct. 2399, 91 L.Ed.2d

49 (1986), the Supreme Court declared that an employer unlawfully "discriminates" against an

employee "because of" his or her "sex" when it perpetrates sex-based harassment that is

sufficiently "severe or pervasive" to alter the "terms, conditions, or privileges" of his or her

employment.  "Harassment which does not alter the 'terms, conditions, or privileges' of one's

employment, however reprehensible it may be, does not run afoul of Title VII."  *Howard v.*

*Blalock Electric Service, Inc.*, 742 F.Supp.2d 681, 689 (W.D.Pa. 2010).  An isolated incident can

16

amount to a change in the "terms, conditions, or privileges" of one's employment only if it is

"extremely serious." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 141

L.Ed.2d 662 (1998). In order for "an atmosphere of sexual harassment or hostility to be

actionable" under Title VII, "the offending behavior 'must be sufficiently severe or pervasive to

alter the conditions of the victim's employment and create an abusive working environment.'"

*Pennsylvania State Police v. Suders*, 542 U.S. 129, 146-147, 124 S.Ct. 2342, 159 L.Ed.2d 204

(2004), quoting *Meritor Savings Bank*, 477 U.S. at 67. This standard incorporates both objective

and subjective elements. In *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21-22, 114 S.Ct. 367,

126 L.Ed.2d 295 (1993), the Supreme Court explained:

> Conduct that is not severe or pervasive enough to create an objectively hostile or
> abusive work environment—an environment that a reasonable person would find
> hostile or abusive—is beyond Title VII's purview. Likewise, if the victim does
> not subjectively perceive the environment to be abusive, the conduct has not
> actually altered the conditions of the victim's employment, and there is no Title
> VII violation.

*Harris*, 510 U.S. at 21-22. The relevant inquiry cannot be reduced to "a mathematically precise

test." *Id.* at 22. In determining whether discriminatory harassment constitutes a violation of

Title VII, a trier of fact must consider whether the harassment is frequent or severe, whether it is

"physically threatening or humiliating," and whether it "unreasonably interferes with an

employee's work performance." *Id.* at 23.

In her first amended complaint, Toth alleges that the University's decision not to promote

her was based, at least in part, on her rejection of "unwanted advances" made by Armenti and

Madden. Docket No. 10 at ¶¶ 60-65, 92-97. She further alleges that these "unwanted advances"

caused her work environment to be "hostile or abusive." *Id.* at ¶¶ 68-73, 100-105. In essence,

Toth relies on the same set of facts to assert both *quid pro quo* and "hostile work environment"

claims. The framework for considering these claims was discussed in *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). In that decision, the Supreme Court remarked:

> We do not suggest the terms *quid pro quo* and hostile work environment are irrelevant to Title VII litigation. To the extent they illustrate the distinction between cases involving a threat which is carried out and offensive conduct in general, the terms are relevant when there is a threshold question whether a plaintiff can prove discrimination in violation of Title VII. When a plaintiff proves that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands, he or she establishes that the employment decision itself constitutes a change in the terms and conditions of employment that is actionable under Title VII. For any sexual harassment preceding the employment decision to be actionable, however, the conduct must be severe or pervasive.

*Burlington Industries*, 524 U.S. at 753-754.[4] The Supreme Court went on to explain that a case involving only "unfulfilled threats" should be treated as a "hostile work environment" case rather than as a *quid pro quo* case. *Id.* at 754. In this case, however, Toth alleges that tangible employment actions were taken against her because she resisted the "unwanted advances" made by Armenti and Madden. Docket No. 10 at ¶¶ 60-65, 92-97. Consequently, her claims must be considered under both theories of discrimination.

In order to establish a violation of Title VII pursuant to a *quid pro quo* theory, Toth must establish that the "unwanted advances" were made by Armenti and Madden because of her "sex." *Oncale*, 523 U.S. at 80-81. She must also demonstrate that there was a causal relationship between her rejection of the "advances" and the subsequent denials of her

---

[4] The issue in *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 746-747, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), centered on the circumstances in which an employer can be held vicariously liable under Title VII for harassment perpetrated by a supervisor. The Supreme Court explained that the issue of vicarious liability turns on agency principles regardless of whether the plaintiff's claim is a *quid pro quo* claim or a "hostile work environment" claim. *Burlington Industries*, 524 U.S. at 752-755. The distinction between these two types of claims, however, remains relevant to the "threshold question" of whether discrimination has occurred. *Id.* at 753.

applications for promotion. *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281-284 (3d Cir. 2000). The evidentiary record will be considered in relation to both of these issues.

On October 19, 2005, Madden emailed Toth a message asking whether the two of them could "sit down for a few minutes sometime." Docket No. 51-2 at 36. He stated that while he was the Acting Dean of the College of Liberal Arts, he was still a member of the APSCUF and did not know how to "appropriately" disagree with his own union. *Id.* Madden invited Toth to have "a nice informal chat over coffee" in a message sent on June 14, 2006. *Id.* at 38. In that message, Madden remarked that he and Toth were "going to be working closely on issues more and more in the future." *Id.* In a message sent on August 9, 2006, Madden again inquired as to whether Toth had time for "a cup of coffee." *Id.* at 37. Toth apparently never responded to Madden's invitations. On August 17, 2006, Madden sent Toth a message reiterating his suggestion that the two of them meet for "a cup of coffee." *Id.* at 39-40. He went on to state that he was willing to earn her respect, and that he did not have a "strong allegiance" to either the "management" or the "union." *Id.*

Shortly after receiving Madden's message of August 17, 2006, Toth responded with a message indicating that she was willing to come to a "professional meeting," and that she wanted her contact with Madden to "remain at the formal, professional level." *Id.* at 39. In an affidavit signed on August 18, 2011, Toth declared that Madden had never responded to her message. Docket No. 70-4 at ¶ 17. On July 10, 2007, Madden declined to recommend that Toth be promoted. Docket No. 70-7 at 18. Toth contends that Madden's meeting invitations constituted "uninvited romantic solicitations," and that Madden's decision not to recommend her for a promotion was attributable to his bitterness over her rejection of those "solicitations." Docket No. 67 at 4-5.

The record indicates that Madden had a "romantic relationship" with Tuennerman-Kaplan during the spring of 2008.  Docket No. 71-1 at 4849; Docket No. 71-2 at 5-8; Docket No. 71-3 at 26-27.  In her brief, Toth insinuates that Madden's "romantic affair with another female subordinate" constitutes evidence that his meeting invitations were really designed to initiate a sexual relationship or encounter with her.  Docket No. 67 at 5.  That line of reasoning, however, requires a long chain of unwarranted inferences to connect the evidence in the record with a showing of sex-based discrimination.

Where a male supervisor expresses a sexual interest in a female subordinate, it is reasonable to assume (in the absence of conflicting evidence) that the supervisor would not express a similar sexual interest in a male subordinate.  *Bibby v. Philadelphia Coca Cola Bottling Co.*, 260 F.3d 257, 262 (3d Cir. 2002).  For this reason, an inference of sex-based discrimination normally arises in any case in which a tangible employment action is linked to an employee's refusal to become sexually involved with a supervisor.  *Jensen v. Potter*, 435 F.3d 444, 454 (3d Cir. 2006)(remarking that "an inference of sex-based intent will usually arise" whenever an individual engages in harassing conduct that is "facially sexual").  The mere fact that a male supervisor has a sexual interest in one female subordinate, however, does not give rise to an inference that he has a similar sexual interest in *another* female subordinate.  In *Oncale*, the Supreme Court noted that a heterosexual individual would not be expected to convey sexually suggestive proposals to "someone of the same sex."  *Oncale*, 523 U.S. at 80.  That is because a heterosexual individual will ordinarily be sexually disinterested in *all* members of the same sex.  It does not follow that a heterosexual individual can be presumed to have a sexual interest in *all* members of the opposite sex.  Because one's sexual attraction to members of the opposite sex is considerably less categorical that his or her sexual aversion to members of the

same sex, no reasonable trier of fact could infer that Madden was seeking to enter into a "romantic relationship" with Toth simply because he subsequently entered into a similar relationship with Tuennerman-Kaplan.

Although Toth characterizes Madden's meeting invitations as "repeated solicitations for an inappropriate relationship," she acknowledged during her deposition that she did not know whether Madden had truly intended to initiate a sexual relationship or encounter with her. Docket No. 51-1 at 36; Docket No. 67 at 8.  When questioned about the matter, Toth testified as follows:

> Q.    Do you think that Sean Madden, in the email requests to have coffee or to chat, was making a sexual advance to you?
>
> A.    I don't know what he was doing.  I subsequently found out he had been having an affair with the woman he made dean when he became provost, so I don't know, maybe he was, maybe he wasn't.  All I know is it was unprofessional and I am glad I didn't put myself in the situation to find out.
>
> Q.    You heard something about that after the period of time relating to your '05/'06 and '06/'07 promotions?
>
> A.    There were always rumors flying around about him, so I didn't know what to believe or what not to believe.  He was always being accused of doing something.  He was always doing unexpected things.  I didn't know if the rumors of him cheating on his wife were true, not true and I didn't care.  I just knew that whatever he was doing in his personal life, I didn't want involved in it.  I wanted to stay professional.
>
> Q.    My question does not—I am not asking you to figure out what Sean Madden was thinking, it was actually the opposite.  My question is, at the time when you received an e-mail from Sean Madden saying I would like to have a cup of coffee or chat or words to that effect, did you perceive that as a sexual advance?
>
> A.    I perceived it as what could possibly be perceived as a sexual advance.  I didn't want to put myself in any position where anybody would hear that I had been having coffee chats with Sean Madden, given the nature of his personality, and there were always rumors flying about him.  I wanted to stay as far away from that as possible and to remain professional.

Docket No. 51-1 at 36.  The ambivalent nature of Toth's testimony suggests that she did not

necessarily perceive Madden's invitations as attempts to begin a sexual relationship, and that she

is merely speculating as to what his intentions were at the time of the communications in

question.  In this context, however, Toth cannot defeat the Defendants' motion for summary

judgment solely by speculating that Madden *might* have had a sexual interest in her.  *Budenz v.*

*Sprint Spectrum, L.P.*, 230 F.Supp.2d 1261, 1273-1274 (D.Kan. 2002).

Toth's reliance on *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271 (3d Cir. 2000), is

unavailing.  Docket No. 67 at 8.  In *Farrell*, the United States Court of Appeals for the Third

Circuit was presented with a situation in which a male supervisor traveling on an airplane with a

female subordinate had allegedly placed his hand on her leg, stated that his wife sometimes

became jealous when he was traveling alone with the subordinate, and asked whether the

subordinate's husband ever became jealous when the subordinate traveled alone with the

supervisor.  *Farrell*, 206 F.3d at 276.  The female subordinate had allegedly responded to the

male supervisor's inquiry by stating, "No, I don't give him a reason to and I suggest you do the

same."  *Id.*  Because of the sexually suggestive nature of the supervisor's inquiry and the

subsequent termination of the subordinate's employment under questionable circumstances, the

Court of Appeals treated the subordinate's sex-based discrimination claim against the employing

entity as a *quid pro quo* claim.  *Id.* at 278-288.  In contrast to the supervisor's inquiry in *Farrell*,

Madden's communications to Toth did not include statements that were suggestive of a sexual

interest.  Madden merely asked Toth if she wanted to meet for "a cup of coffee."  Docket No. 51-

2 at 37, 39.  An offer of this kind may reasonably be extended to any individual, regardless of his

or her gender.  Indeed, Madden specifically complained in his message of August 17, 2006, that

Toth's male predecessor had been unwilling to meet with certain University officials to discuss union-related matters. *Id.* at 39. Madden went on to mention several work-related matters that he wanted to discuss with Toth. *Id.* at 40. Under these circumstances, no reasonable trier of fact could conclude that Madden wanted to meet with Toth because of her sex.[5] *Guarino v. St. John Fisher College*, 553 F.Supp.2d 252, 261-262 (W.D.N.Y. 2008).

At Madden's request, Toth attended a "pie-throwing" fundraiser on May 3, 2007. Docket Nos. 68 & 75 at ¶ 32. She paid for a pie and threw it in Madden's face. *Id.* Madden responded by hugging Toth tightly and smearing pie cream on her face, hair, neck and chest. *Id.* at ¶¶ 33-34. After her encounter with Madden, Toth apparently left the event and went home. *Id.* at ¶ 41.

During her deposition, Toth provided the following testimony about the incident at the fundraiser:

Q.    Why did you accept his invitation to show up for this pie throwing?

A.    A good faith attempt to participate in an administrative APSCUF endeavor.

Q.    Now, you said, I think, in one of your answers, that you think you paid for a pie and threw a pie at Sean Madden?

A.    Yes, he was a target. When I went down there, he was the target.

Q.    And you hit him with the pie?

A.    Yes.

Q.    And then what happened?

A.    Then he lunged forward, grabbed me in a bear hug, held me tightly in a bear hug up against his body and rubbed himself all over me, with special emphasis in trying to get that stuff to cover as much of my body as he

---

[5] The Court acknowledges that "conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex." *Oncale v. Sundower Offshore Services, Inc.*, 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). Since Toth relies on a *quid pro quo* theory, however, her inability to establish that Madden's communications were sexually motivated eliminates her basis for inferring that those same communications would not have been sent to a male in her position.

possibly could.  And then somebody yelled back something like, "You
didn't jump back fast enough" or—and then the sex jokes started.  "Donna
and I don't need pie throwing contests as an excuse to get out the whipped
cream."  And Joyce Hanley said something to the effect of, "Oh, after
something like that, she deserve as [sic] raise."  I guess the reference was
to the informational picket rally and the negotiations or something.  I don't
know what it is.

Docket No. 51-1 at 54-55.  When asked about the duration of Madden's contact with her body,

Toth testified as follows:

Q.    Well, you indicated that he had you in a bear hug or had you in his grasp?

A.    Oh, yes, he did.

Q.    How long?  For how long?  A matter of seconds?

A.    Long enough to cover almost every part of the front of my body with his
      goo.  I had to wash my clothes, wash my hair, go home immediately
      afterwards.  I couldn't walk around like that.

Q.    Could you say whether it was more or less than 10 seconds?

A.    Longer than 10 seconds.  He was thoroughly enjoying this.  It almost
      seemed like it was a culmination of something to him.

Q.    Was it more than 30 seconds?

A.    I would say.  I would say, yes.  I would say, yes, it seemed like even more
      than that.

Q.    Did—

A.    He seemed to be enjoying it immensely, and everybody was enjoying it.

*Id.*  Toth went on to state that she had been "shocked," "upset," "disgusted" and "repulsed" by

the incident.  *Id.* at 56.

In her brief, Toth describes Madden's conduct as an "amorous advance" that was both

"physical" and "degrading."  Docket No. 67 at 8.  Despite Toth's characterization of the incident

24

as a sexual "advance," no reasonable trier of fact could conclude that Madden's behavior

amounted to an "earnest sexual solicitation." *English v. Pohanka of Chantilly, Inc.*, 190

F.Supp.2d 833, 845 (E.D.Va. 2002).  Madden's actions were taken in the presence of other

University employees and did not involve an explicit sexual proposition.  *Id.* at 845-846.  In the

*quid pro quo* context, "[t]here is a significant distinction between harassment that is sexual in

content and harassment that is sexually motivated."  *Id.* at 840.  Even if the encounter was

perceived by Toth and others to be "tinged with offensive sexual connotations," nothing in the

record suggests that it was viewed as a serious attempt by Madden to initiate a sexual

relationship.  *Oncale*, 523 U.S. at 81.  After all, Madden made contact with Toth's body

immediately after she had thrown a pie in his face.  The surrounding circumstances were not

suggestive of a serious or businesslike atmosphere.  Toth herself stated that Madden's objective

had been to cover her with the same pie cream that she had just thrown on him.  Docket No. 51-1

at 55.  Toth does not allege that Madden improperly touched or fondled her breasts or genital

area, or that he pressed his genital area against her body.  *English*, 190 F.Supp.2d at 845 (holding

that an individual's "reprehensible act" of "pressing his genitals" against another person's

shoulder could not reasonably be viewed as a serious sexual solicitation in light of the

surrounding circumstances).  Under these circumstances, no reasonable jury could conclude that

Madden's conduct in relation to Toth was something more serious than "teasing" or "horseplay."

*Id.* at 846.

Toth alleged in her EEOC charge that, during the meeting conducted on July 20, 2007,

Armenti had "stroked" her hand and promised that a promotion would be forthcoming.  Docket

No. 70-7 at 25-28.  She later testified that he had "stroked" her hand and promised that she

would eventually be promoted.  Docket No. 51-1 at 22.  During his deposition, Armenti

acknowledged that he had placed his hand on top of Toth's hand in an attempt to calm her down. Docket No. 51-6 at 19. He denied that he had "stroked" her hand. *Id.* at 23. Armenti stated that he had tried to convince Toth to speak with Madden about her desire for a promotion. *Id.* at 19.

In the present context, the facts must be viewed in the light most favorable to Toth. *Watson*, 478 F.3d at 147. For this reason, any conflict in the testimonial evidence must be resolved in her favor. *Thompson v. Wagner*, 631 F.Supp.2d 664, 678 (W.D.Pa. 2008). In her brief, Toth intimates that Armenti's "seductive stroking" of her hand, when coupled with his alleged promise that she would be promoted, constitutes evidence that his subsequent decisions denying her applications in December 2009 and January 2010 were motivated by her unwillingness to engage in sexual activities with him. Docket No. 67 at 8-9. The problem with Toth's position is that it is inconsistent with her own deposition testimony. When asked about Armenti's conduct and demeanor at the time of the meeting, Toth testified that Armenti's act of "stroking" her hand had constituted a form of "sexual harassment." Docket No. 51-1 at 36. Yet, she denied that she had used the term "sexual advance" to describe Armenti's conduct. *Id.* In this respect, Toth seemed to take issue with the very language contained in her first amended complaint. Docket No. 10 at ¶¶ 60, 65, 68, 92, 97, 100. In order to establish a violation of Title VII based on a *quid pro quo* theory, Toth must demonstrate that her response to Armenti's "sexual advance" was later used as a basis for denying her promotion applications. *Farrell*, 206 F.3d at 281-282. Toth's own testimony illustrates that Armenti's conduct on July 20, 2007, did not constitute an "earnest sexual solicitation." *English*, 190 F.Supp.2d at 845. Consequently, no reasonable trier of fact could conclude that Armenti based his decisions denying Toth's applications for promotion on her unwillingness or refusal to engage in sexual activities. *Budenz*, 230 F.Supp.2d at 1274.

26

Because the record cannot support a finding that Madden or Armenti attempted to begin a sexual relationship with Toth, the Defendants are entitled to summary judgment with respect to Toth's *quid pro quo* claims under Title VII and the PHRA.  Docket No. 10 at ¶¶ 59-66, 91-98. The conduct of Madden and Armenti, however, remains relevant to Toth's "hostile work environment" claims.  *Id.* at ¶¶ 67-74, 99-106.  Although Toth clearly cannot demonstrate that "a tangible employment action resulted from [her] refusal to submit to a supervisor's sexual demands," it remains to be determined whether the actions of her supervisors nevertheless constituted "sexual harassment" that was sufficiently "severe or pervasive" to constitute actionable violations of Title VII and the PHRA.  *Burlington Industries*, 524 U.S. at 753-754.

Toth's "hostile work environment" claims are based primarily on the harassing conduct allegedly engaged in by Armenti and Madden.[6]  Docket No. 10 at ¶¶ 68-72, 99-104.  That conduct, however, was not sufficiently severe or pervasive to constitute actionable violations of Title VII and the PHRA.  An objectively reasonable employee would not have found Madden's invitations to meet for "a cup of coffee" to be hostile or abusive.  The incident at the "pie-throwing" fundraiser occurred in a "social context" in which outlandish behavior was to be expected.  *Oncale*, 523 U.S. at 81-82.  Armenti only touched Toth's hand, which was not an intimate part of her body.  *Worth v. Tyler*, 276 F.3d 249, 268 (7th Cir. 2001)(recognizing that "direct contact with an intimate body part constitutes one of the most severe forms of sexual harassment").  While the conduct of Madden and Armenti may have invaded Toth's personal space and caused her to suffer some degree of humiliation, it did not render her work environment sufficiently hostile or abusive to be violative of Title VII and the PHRA.  *Dreshman*

---

[6] Although Toth appears to rely on Armenti's decisions denying her promotion applications in support of her "hostile work environment" claims, those decisions must be treated as discrete acts of alleged discrimination. Docket No. 10 at ¶¶ 73, 105; *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 113, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002)(explaining that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges").

*v. Villa*, 733 F.Supp.2d 597, 614-615 (W.D.Pa. 2010).  It is also worth noting that Toth has presented no evidence which suggests that the behavior of her supervisors had the effect of interfering with her duties as a professor.  *Harris*, 510 U.S. at 23.

Toth attempts to buttress her "hostile work environment" claims by pointing to the conduct of Armenti and Madden in relation to other women.  Docket No. 67 at 4-6.  Joyce Hanley ("Hanley"), the University's Executive Vice-President, testified that Armenti "had a habit" of placing his hands on the hands of women while trying to calm them down.  Docket No. 51-11 at 8.  Domenica Stalvey ("Stalvey"), Armenti's Executive Associate, similarly testified that Armenti had "patted" the hands of women during the course of "emotional" discussions.[7] Docket No. 51-12 at 11-12.  In a declaration dated August 17, 2011, Laura DeFazio ("DeFazio"), a Professor of Liberal Arts, described situations in which Madden had shouted expletives at female subordinates and made offensive comments about his wife's sexual practices.  Docket No. 71-12 at ¶¶ 3-13.  DeFazio stated that she had left her previous position as a departmental chairperson because of Madden's hostility toward women.  *Id.* at ¶ 6.

The manner in which Armenti and Madden allegedly treated other women has no bearing on Toth's "hostile work environment" claims.  As noted earlier, the relevant inquiry incorporates both objective and subjective components.  *Harris*, 510 U.S. at 21-22.  In order to establish a violation of Title VII pursuant to a "hostile work environment" theory, Toth must demonstrate that she subjectively perceived her work environment to be abusive.  *Id.*  She points to nothing in the record which suggests that she was aware of the manner in which Armenti and Madden interacted with other women.  Toth testified that she could not remember or identify specific instances in which Armenti or Madden had made offensive statements about women.  Docket

---

[7] The testimony of Hanley and Stalvey does not necessarily support an inference that Armenti's actions were offensive or sex-based.  Hanley explained that she had never found Armenti's contact with her hand to be offensive. Docket No. 51-11 at 8.  Stalvey stated that she had seen Armenti "pat" Madden's hand.  Docket No. 51-12 at 12.

No. 51-1 at 3-4.  "[A]n employee who is *totally unaware* of harassing behavior cannot subjectively *perceive* such conduct to be hostile or abusive."  *Howard*, 742 F.Supp.2d at 694 (emphasis in original), citing *Cottrill v. MFA, Inc.*, 443 F.3d 629, 636-638 (8th Cir. 2006).  The Court acknowledges that an employee's work environment may be adversely affected by a supervisor's mistreatment of similarly-situated employees.  *Broderick v. Ruder*, 685 F.Supp. 1269, 1277-1278 (D.D.C. 1988).  A female employee may perceive her own work environment to be hostile or abusive if she frequently *witnesses* a supervisor harass or ridicule other women. It does not follow, however, that an employee can construct a viable "hostile work environment" claim by referring to harassing conduct of which he or she was not even aware during the period of time at issue.  *Harris*, 510 U.S. at 21-22 (explaining that "if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation").  Since Toth had no subjective knowledge of the alleged incidents involving other women prior to the commencement of this action, her reliance on those incidents is misplaced.[8]  *Cottrill*, 443 F.3d at 636-639.

Toth faults Armenti for failing to discipline Madden for having a "romantic affair" with Tuennerman-Kaplan.  Docket No. 67 at 5.  Nonetheless, Madden's relationship with Tuennerman-Kaplan is totally irrelevant to Toth's "hostile work environment" claims.  Title VII does not prohibit consensual "relationships" between supervisors and subordinates.  Indeed, many employees would find an employer's interference with a consensual relationship to be

---

[8] James Hefti ("Hefti") was the University's Director of Professional Golf Management from 2004 to 2008.  Docket No. 70-10 at ¶ 2.  During that period of time, his departmental chairman was William Biddington ("Biddington").  *Id.* at ¶ 3.  In an affidavit dated March 31, 2011, Hefti declared that Biddington had accused Armenti of using gender-specific expletives to describe Toth.  *Id.* at ¶ 8.  The Defendants posit that, during a deposition, Biddington denied that he had attributed sexist statements to Armenti in relation to Toth.  Docket No. 74 at 2.  Toth nevertheless relies on Hefti's affidavit in support of her "hostile work environment" claims.  Docket No. 77 at 2.  The parties disagree as to whether the statements contained in that affidavit constitute inadmissible hearsay.  Docket No. 74 at 2; Docket No. 77 at 2-4.  There is no need for the Court to consider this evidentiary dispute.  Since Toth was not aware of the statements allegedly made by Armenti in any event, they have no bearing on her "hostile work environment" claims.  *Cottrill v. MFA, Inc.*, 443 F.3d 629, 636-639 (8th Cir. 2006).

highly objectionable. *Lawrence v. Texas*, 539 U.S. 558, 572, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003)(referring to "an emerging awareness that liberty gives substantial protection to adult persons in deciding how to conduct their private lives in matters pertaining to sex").  Since Madden's consensual relationship with Tuennerman-Kaplan did not constitute "sexual harassment," it follows *a fortiori* that the relationship did not render Toth's work environment hostile or abusive. *Drinkwater v. Union Carbide Corp.*, 904 F.2d 853, 859-863 (3d Cir. 1990)(holding that a female employee could not establish an actionable violation of a New Jersey anti-discrimination statute by relying on a consensual relationship between her male supervisor and another female employee).  Moreover, Toth cannot establish a violation of Title VII by contending that Tuennerman-Kaplan received preferential treatment because of her relationship with Madden. *Womack v. Runyon*, 147 F.3d 1298, 1299-1300 (11th Cir. 1998).  For these reasons, Madden's actions in relation to Tuennerman-Kaplan provide no support for Toth's "hostile work environment" claims.

   To the extent that Toth subjectively perceived her work environment to be hostile or abusive because of the behavior of Madden at the "pie-throwing" fundraiser or the conduct of Armenti at the meeting conducted on July 20, 2007, that perception was not objectively reasonable. *Harris*, 510 U.S. at 21.  The Defendants are entitled to summary judgment with respect to Toth's "hostile work environment" claims.  Docket No. 10 at ¶¶ 67-74, 99-106.  Given that no reasonable trier of fact could conclude that Armenti or Madden actually tried to initiate a sexual relationship with Toth, the Defendants are likewise entitled to summary judgment with respect to her *quid pro quo* claims. *Id.* at ¶¶ 59-66, 91-98.  Accordingly, the Court will dismiss all of Toth's "harassment" claims under Title VII and the PHRA. *Id.* at ¶¶ 59-74, 91-106.

   **B.    The Trait-Based Discrimination Claims**

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a). The protection from sex-based discrimination provided under Title IX extends not only to students attending covered educational institutions, but also to individuals employed by those institutions. *New Haven Board of Education v. Bell*, 456 U.S. 512, 520-535, 102 S.Ct. 1912, 72 L.Ed.2d 299 (1982). In *Cannon v. University of Chicago*, 441 U.S. 677, 709-717, 90 S.Ct. 1946, 60 L.Ed.2d 560 (1979), the Supreme Court held that victims of sex-based discrimination could seek redress under Title IX even though the applicable statutory language provided only for the discontinuation of an offending entity's federal financial assistance. Congress later embraced the holding in *Cannon* by abrogating the States' Eleventh Amendment immunity in actions brought under Title IX by private individuals. Pub. L. No. 99-506, § 1003; 100 Stat. 1807, 1845 (1986); 42 U.S.C. § 2000d-7(a). In light of this legislative action, it is "beyond dispute" that private individuals can sue recipients of federal financial assistance under Title IX. *Alexander v. Sandoval*, 532 U.S. 275, 280, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001). Monetary relief is available in actions brought under Title IX to redress instances of sex-based discrimination. *Franklin v. Gwinnet County Public Schools*, 503 U.S. 60, 76, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992).

Toth alleges that the University violated both Title VII and Title IX by failing to promote her because of her "sex." Docket No. 10 at ¶¶ 50-58, 127-136. She further alleges that the University violated Title VII by failing to promote her because of her "national origin." *Id.* at ¶¶ 50-58. In addition to the Title VII and Title IX claims brought against the University, Toth brings discrimination claims against Armenti and Madden under the PHRA. *Id.* at ¶¶ 82-90.

31

Since this is an employment discrimination case in which no "direct evidence" of discrimination is presented, the Supreme Court's analyses in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), provide the formulation for allocating the requisite burdens of proof and production for purposes of the pending motions for summary judgment.[9]  In an employment discrimination case of this kind, the plaintiff must establish a *prima facie* case of illegal discrimination.  *McDonnell Douglas*, 411 U.S. at 802.  If a *prima facie* case of discrimination is established, the defendant must articulate legitimate, nondiscriminatory reasons for treating the plaintiff in an adverse manner.  *Id.* at 802-803.  If the defendant articulates legitimate, nondiscriminatory reasons for the plaintiff's adverse treatment, the plaintiff must demonstrate that the reasons given by the defendant for such treatment are merely a pretext for unlawful employment discrimination.  *Id.* at 804-805.  Evidence suggesting that an employer's stated reasons for an adverse employment action are unworthy of credence is one form of circumstantial evidence that a plaintiff can use to establish the existence of intentional discrimination.  *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003).

The plaintiff's burden of establishing a *prima facie* case of disparate treatment is not onerous.  *Burdine*, 450 U.S. at 253.  In order to establish a *prima facie* case of discrimination, the plaintiff need only show that: (1) he or she was a member of a statutorily-protected class; (2) he or she was aggrieved by an adverse employment action; and (3) the adverse employment action

---

[9] The *McDonnell Douglas-Burdine* burden-shifting framework does not apply in an employment discrimination case in which "direct evidence" of discrimination is presented.  *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).  "Direct evidence" of discrimination is evidence that is "so revealing of discriminatory animus that it is not necessary to rely on any presumption" from the plaintiff's *prima facie* case to shift the applicable burden of production to the defendant.  *Starceski v. Westinghouse Electric Corp.*, 54 F.3d 1089, 1096, n. 4 (3d Cir. 1995).  The evidence presented by Toth does not constitute "direct evidence" of discrimination.

occurred under circumstances giving rise to an inference of illegal discrimination. *Shah v. Bank of America*, 598 F.Supp.2d 596, 604 (D.Del. 2009). The specific elements of a *prima facie* case generally "depend on the facts of the particular case" before the court and "cannot be established on a one-size-fits-all basis." *Jones v. School District of Philadelphia*, 198 F.3d 403, 411 (3d Cir. 1999). The *prima facie* inquiry "remains flexible and must be tailored to fit the specific context in which it is applied." *Sarullo v. United States Postal Service*, 352 F.3d 789, 797-798 (3d Cir. 2003). Because the *prima facie* inquiry in any case is fact-specific, "[t]he touchstone of the inquiry is whether the circumstances giving rise to an inference of discrimination are of *evidentiary value*, not whether they fit into a mechanical formula." *Cobetto v. Wyeth Pharmaceuticals*, 619 F.Supp.2d 142, 153, n. 3 (W.D.Pa. 2007)(emphasis in original), citing *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 312-313, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996). A *prima facie* case "raises an inference of discrimination" sufficient to shift the burden of production to the defendant. *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978). This inference is based on an assumption that certain actions, if left unexplained, "are more likely than not based on the consideration of impermissible factors." *Id.*

If the plaintiff establishes a *prima facie* case of discrimination, the burden of production shifts to the defendant to rebut the presumption of discrimination through the introduction of admissible evidence indicating that the challenged employment action was taken for legitimate, nondiscriminatory reasons. *Burdine*, 450 U.S. at 254-255. To sustain this burden, "[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons." *Id.* at 254. The inquiry concerning whether the defendant has met its burden of production "can involve no credibility assessment," since "the burden-of-production determination necessarily

*precedes* the credibility-assessment stage." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)(emphasis in original).  The defendant satisfies its burden of production, and rebuts the plaintiff's *prima facie* showing of discrimination, simply by introducing admissible evidence that, *if taken as true*, would *permit* a finding that the challenged employment action was taken for legitimate, nondiscriminatory reasons.  *Id.*

If the defendant meets its burden of production, the dispositive factual issue is framed with "sufficient clarity" to provide the plaintiff with "a full and fair opportunity to demonstrate pretext." *Burdine*, 450 U.S. at 255-256.  In order to establish that the defendant is liable for illegal employment discrimination, the plaintiff must ultimately convince the trier of fact that a discriminatory animus was the *real reason* for the adverse employment action at issue.  *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994).  Liability cannot be established upon a jury's mere *disbelief* of the defendant's proffered reasons for an adverse employment action, but rather upon the jury's *affirmative belief* of the plaintiff's contention that the action was taken on the basis of an impermissible discriminatory criterion.  *St. Mary's Honor Center*, 509 U.S. at 519 ("It is not enough, in other words, to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination.")(emphasis in original).  Nevertheless, evidence suggesting that an employer's proffered reasons for an adverse employment action are false, when coupled with a plaintiff's *prima facie* case, may sufficiently undermine the employer's credibility to enable a reasonable trier of fact to conclude that illegal discrimination has occurred. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147-148, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).  Evidence used to establish a *prima facie* case of discrimination may also be relied upon to demonstrate pretext, since nothing about the *McDonnell Douglas-Burdine* burden-shifting framework requires a court to ration the evidence presented in a particular case among

34

the *prima facie* and pretext stages of the analysis. *Doe v. C.A.R.S. Protection Plus, Inc.*, 527

F.3d 358, 370 (3d Cir. 2008). Proof that an employer's explanation for an adverse employment

action is unworthy of credence can be a powerful form of circumstantial evidence that is

probative of intentional discrimination. *Reeves*, 530 U.S. at 147. Circumstantial evidence is not

only sufficient to sustain a finding of liability for intentional discrimination, "but may also be

more certain, satisfying and persuasive than direct evidence." *Desert Palace*, 539 U.S. at 100,

quoting *Rogers v. Missouri Pacific Railroad Co.*, 352 U.S. 500, 508, n. 17, 77 S.Ct. 443, 1

L.Ed.2d 493 (1957). Depending on the circumstances of the particular case, a plaintiff can

sometimes prevail on the basis of circumstantial evidence without introducing "additional,

independent evidence of discrimination." *Reeves*, 530 U.S. at 149. Whether summary judgment

is warranted in a given case depends upon the strength of the plaintiff's *prima facie* case, the

probative value of the evidence discrediting the defendant's proffered reasons for the challenged

employment action, and the presence or absence of additional evidence that may properly be

considered by a court in determining whether a judgment as a matter of law is appropriate. *Id.* at

148-149.

      1.      **National Origin**

      Title VII prohibits a covered employer from discriminating against an employee because

of his or her "national origin." 42 U.S.C. § 2000e-2(a). The Supreme Court has construed the

term "national origin" broadly enough to prohibit discrimination based on an individual's

ancestry. *Espinoza v. Farah Manufacturing Co., Inc.*, 414 U.S. 86, 88, 94 S.Ct. 334, 38 L.Ed.2d

287 (1973)("The term 'national origin' on its face refers to the country where a person was born,

or, more broadly, the country from which his or her ancestors came."). The PHRA expressly

prohibits a covered employer from discriminating against an employee because of his or her "ancestry" or "national origin."  43 PA. STAT. § 955(a).

Toth alleges that she was not promoted because of her Polish ancestry.  Docket No. 10 at ¶¶ 50-58, 82-90.  She testified that Armenti had referred to her as a "provocative Pollock" prior to a meeting conducted during the early part of 2007.  Docket No. 51-1 at 9-10.  He apparently made this reference to Toth's ancestry while suggesting that the meeting would be over more quickly if Toth, the "provocative Pollock," did not "open her mouth."  *Id.* at 10.  Toth met with Armenti and the University's golf coach, Merrilyn Gibbs ("Gibbs"), on May 4, 2007.  The meeting was apparently conducted so that Gibbs' contract could be renewed over the objection of the University's Athletic Director.  Docket No. 51-6 at 19.  During the meeting, Armenti allegedly exclaimed that Toth was a "Pollock just like [his] wife."  Docket No. 51-18 at 2.  On July 20, 2007, Toth emailed Gibbs a message inquiring as to whether she had found the statement to be offensive.[10]  *Id.*  Four days later, Gibbs responded by stating that she did not believe that Armenti had tried to be offensive, and that he had merely "tried to say something slightly abrasive in a way that was not offensive."  *Id.* at 1.

Aside from the two statements allegedly made by Armenti, Toth points to nothing in the record which suggests that she was not promoted because of her "national origin" or "ancestry."  Docket No. 67 at 31.  Stray remarks uttered by decisionmakers are "rarely given great weight" in the employment discrimination context.  *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 333 (3d Cir. 1995).  This is especially true when such remarks are wholly unrelated to the

---

[10] The Court notes that Toth sent her message to Gibbs shortly after meeting with Armenti about her promotion application.  Docket No. 51-18 at 2.  Although the accounts of the meeting provided by Toth and Armenti differed in some respects, it is undisputed that Armenti became angry and ended the meeting after learning that Toth's "Plan B" would include the pursuit of an allegation that he had discriminated against her because of her Polish ancestry.  Docket No. 51-1 at 22; Docket No. 51-6 at 19.  Armenti was apparently offended by Toth's assertion that he had insulted her by calling her a "Pollock."  *Id.*

decisionmaking process.  *Id.*  In the present case, Armenti's use of the term "Pollock" was not necessarily derogatory.  Armenti apparently used the term to reference a characteristic that Toth shared with his own wife.  Docket No. 51-18 at 1-2.  This is not a situation in which an individual's reference to another person's ancestry is indicative of a discriminatory animus. *Gray v. United States Postal Service*, 133 F.Supp.2d 593, 597-599 (N.D.Ohio 2001)(describing a situation in which a supervisor had allegedly vandalized an employee's vehicle by inscribing the word "Pollock" on her trunk).  Since Armenti's comments do not give rise to an inference that Toth was not promoted because of her "national origin" or "ancestry," Toth cannot establish a *prima facie* case of discrimination based on her Polish heritage.  The Defendants' motion for summary judgment will be granted with respect to Toth's discrimination claims to the extent that those claims are based on her status as a descendant of Polish nationals.  Docket No. 10 at ¶¶ 50-58, 82-90.

> **2.     Sex**

Toth maintains that the University did not promote her because of her sex.  She seeks redress against the University under Title VII and Title IX.  Docket No. 10 at ¶¶ 50-58, 127-136. She also asserts corresponding claims against Armenti and Madden under the PHRA.  *Id.* at ¶¶ 82-90.  In a stipulation filed on May 25, 2011, Toth clarified that she seeks relief under Title VII and the PHRA only for the initial denial of her 2006/2007 promotion application and Armenti's subsequent decisions denying both promotion applications in December 2009 and January 2010. Docket No. 36 at ¶ 4(a).  She does not seek relief for the initial denial of her 2005/2006 promotion application.[11]  *Id.*  Toth further clarified that she seeks relief under Title IX only for

---

[11] Toth's 2005/2006 promotion application was initially denied on July 14, 2006.  Docket No. 51-3 at 44.  Her charges of discrimination were not filed with the PHRC and the EEOC until August 23, 2007, and November 9, 2007.  Docket Nos. 68 & 75 at ¶ 143; Docket No. 70-7 at 25-28.  Since more than 300 days elapsed between the initial denial of Toth's 2005/2006 promotion application and the filing of her charges of discrimination, any claims

the December 2009 and January 2010 decisions denying her promotion applications, and that she

does not seek relief thereunder for the initial denials of her 2005/2006 and 2006/2007 promotion

applications.[12]  *Id.* at ¶ 4(b).  Nonetheless, Toth relies on both initial denials as background

evidence supporting her allegations of sex-based discrimination.[13]

It is undisputed that Toth was within the category of persons entitled to statutory

protection from sex-based discrimination when her promotion applications were denied, and that

the denials of those applications constituted adverse employment actions.  The parties' dispute

with respect to the *prima facie* inquiry relates to whether the applications were denied under

circumstances giving rise to an inference of sex-based discrimination.  *Shah*, 598 F.Supp.2d at

604.  In order to establish her *prima facie* case, Toth may rely on any form of evidence which is

"adequate to create an inference" that she was not promoted because of her sex.  *Pivirotto v.*

*Innovative Systems, Inc.*, 191 F.3d 344, 355 (3d Cir. 1999).

Among the most important factors relevant to the *prima facie* inquiry is Toth's ability to

qualify for the promotion that she sought.  An applicant's inability to qualify for a position or

promotion is one of the most common (if not *the* most common) reason why an employer may

decline to hire or promote him or her.  *Burdine*, 450 U.S. at 253-254.  For this reason, no

inference of discrimination can be drawn where an applicant who is obviously unqualified for the

desired position or promotion is rejected.  *Howard*, 742 F.Supp.2d at 700, n. 9 (observing that

"no inference of sex-based discrimination can be drawn where a hospital seeking to employ a

---

based on that initial denial would be time-barred.  *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 108-115, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002).

[12] The United States Court of Appeals for the Third Circuit has "borrowed" Pennsylvania's two-year statute of limitations for personal injury actions in actions brought under Title IX.  *Bougher v. University of Pittsburgh*, 882 F.2d 74, 77-78 (3d Cir. 1989); 42 PA. CONS. STAT. § 5524.  Toth commenced this action on December 24, 2009. Docket No. 1.  Since Toth's promotion applications were initially denied on July 14, 2006, and July 10, 2007, any Title IX claims stemming from those initial denials would be barred by the applicable statute of limitations.

[13] The applicable statutes of limitations do not bar Toth from relying on the initial denials of her promotion applications as "background evidence" in support of her timely-filed claims.  *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 113, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002).

new surgeon chooses to hire a female physician rather than a male with no medical background"). In the present case, however, the UWPC twice recommended that Toth be promoted to the position of Full Professor of Psychology. Docket No. 51-3 at 43; Docket No. 70-7 at 16. The Court does not understand the Defendants to argue that Toth was completely unqualified for the promotion. Under these circumstances, it cannot be doubted that Toth was a "qualified" applicant when she submitted her promotion applications. *Makky v. Chertoff*, 541 F.3d 205, 215-216 (3d Cir. 2008).

During the 2005/2006 promotion cycle, four males and two females applied for promotions to the position of Full Professor. Docket No. 51-3 at 43. The males were Al-Kattar, Nass, Black and DeHainaut. *Id.* The females were Michael and Toth. *Id.* The UWPC ranked Toth fourth among the six applicants. *Id.* Al-Kattar, Nass and Michael were ranked higher than Toth, while Black and DeHainaut received lower rankings. *Id.* The UWPC recommended that Al-Kattar, Nass, Michael, Toth and Black be promoted, and that DeHainaut not be promoted. *Id.* Thompson, however, decided to recommend only Al-Kattar, Nass and Michael for promotion. *Id.* In accordance with Thompson's recommendation, Armenti approved the applications submitted by Al-Kattar, Nass and Michael and rejected the applications submitted by Toth, Black and DeHainaut. *Id.* at 44. As a result, the University promoted two of the four male applicants and one of the two female applicants.

Two males and six females applied for promotions to the position of Full Professor during the 2006/2007 promotion cycle. Docket No. 70-7 at 16. The males were Zisk and DeHainaut. *Id.* The females were O'Connor, Salotti, Hess, Barksdale, Milford and Toth. *Id.* The UWPC assigned Toth a ranking of fifth among the eight applicants. *Id.* Zisk, O'Connor, Salotti and Hess were ranked ahead of her, while DeHainaut, Barksdale and Milford were ranked

39

below her.  *Id.*  Eight members of the UWPC voted 4-4 as to whether Milford should be promoted.  *Id.*  The UWPC recommended the remaining seven applicants for promotion.  *Id.*  Nevertheless, Madden decided to recommend that only Zisk, O'Connor, Salotti and Barksdale be promoted.  *Id.* at 18.  Armenti ultimately followed Madden's recommendation.  *Id.* at 20.  The University initially promoted one of the two male applicants and three of the six female applicants.  Hess was promoted shortly thereafter, making her the fourth of the six female applicants to receive a promotion.  Docket No. 53 at 15, n. 7.  The initial decision denying Hess' application had apparently been based on a mathematical error pertaining to a policy permitting only 3% of the University's Full Professors to have less than a terminal degree.  *Id.*

During the two promotion cycles, the University promoted male and female applicants on an equal basis.  Since Armenti was required to reconsider only Toth's applications pursuant to Jaffe's decision of July 20, 2009, no other applicants were involved in the reconsideration process.  Docket No. 51-4 at 1-67.  The circumstances surrounding the University's decisions during the promotion cycles at issue do not give rise to an inference that Toth's applications were rejected because of her sex.

Toth attempts to narrow the *prima facie* inquiry by pointing out that she and Zisk were the only two applicants to receive the *unanimous* support of the UWPC's members during the 2006/2007 promotion cycle.  Docket No. 67 at 9-10.  The members of the UWPC voted 9-0 to recommend both Zisk and Toth.  Docket No. 70-7 at 16.  Toth contends that an inference of sex-based discrimination can be drawn from the fact that the University ultimately denied her application while promoting Zisk.  Docket No. 67 at 9-10.

The argument advanced by Toth is unpersuasive.  When the University decided to promote Zisk, both his Dean and the UWPC had recommended that he be promoted.  Docket No.

40

70-7 at 19.  Toth did not have Tuennerman-Kaplan's recommendation behind her when her application was presented to the UWPC and Madden.  *Id.*  The University promoted Barksdale, a female with a lower ranking than Toth, even though the members of the UWPC had only voted 5-4 to recommend her promotion.  *Id.* at 16, 18-19.  Unlike Toth, Barksdale had received a favorable recommendation from her Dean.  *Id.* at 19.  Among the eight applicants, only DeHainaut and Toth failed to secure favorable recommendations from their respective Deans. *Id.*  Neither DeHainaut nor Toth was promoted.  Although Milford had received a recommendation from her Dean, the UWPC did not recommend her promotion.  *Id.*  The five applicants who had the support of their respective Deans and the UWPC were ultimately promoted.  The three applicants who failed to secure one of the two recommendations were rejected.  It is also worth noting that while Jaffe prohibited Armenti from considering the recommendations made by Thompson and Madden during the reconsideration process, he specifically permitted Armenti to consider Tuennerman-Kaplan's opinion in determining whether Toth should be promoted.  Docket No. 51-4 at 54.

Toth cannot establish a violation of Title VII, Title IX or the PHRA simply by demonstrating that the University's decisions denying her promotion applications were "wrong or mistaken."  *Fuentes*, 32 F.3d at 765.  The dispositive question is whether Toth was not promoted *because of her sex*.  *Oncale*, 523 U.S. at 80-81.  A plaintiff cannot establish a *prima facie* case of unlawful discrimination simply by speculating that the adverse employment action complained of was taken on the basis of an illicit discriminatory criterion.  *Hicks v. Tech Industries*, 512 F.Supp.2d 338, 348 (W.D.Pa. 2007).  Instead, he or she must produce evidence that is adequate to create an inference that the challenged employment action was based on such a criterion.  *O'Connor*, 517 U.S. at 312-313.  Since an inference of sex-based discrimination

41

cannot reasonably be drawn from the evidence presented by Toth, the Defendants are entitled to summary judgment with respect to her sex-based discrimination claims under Title VII, Title IX and the PHRA.[14]  Docket No. 10 at ¶¶ 50-58, 82-90, 127-136.

### C.      The Retaliation Claims

Title VII's anti-retaliation provision declares it to be an "unlawful employment practice" for a covered employer "to discriminate against" an employee "because he [or she] has opposed any practice made an unlawful employment practice" by Title VII, or "because he [or she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" thereunder.  42 U.S.C. § 2000e-3(a).  The PHRA similarly declares it to be an "unlawful discriminatory practice" for a covered employer "to discriminate in any manner against any individual because such individual has opposed any practice forbidden by [the PHRA], or because such individual has made a charge, testified or assisted, in any manner, in any investigation, proceeding or hearing" thereunder.  43 PA. STAT. § 955(d).  Given that these statutory provisions contain similar language, they are generally construed to provide individuals with a coterminous degree of protection from retaliation.  *Prise v. Alderwoods Group, Inc.*, 657 F.Supp.2d 564, 604-605 (W.D.Pa. 2009).

In *Jackson v. Birmingham Board of Education*, 544 U.S. 167, 179, 125 S.Ct. 1497, 161 L.Ed.2d 361 (2005), the Supreme Court held that the "discrimination" prohibited under Title IX is broad enough to encompass retaliation against an individual who complains about sex-based discrimination perpetrated by a recipient of federal financial assistance.  Courts typically apply the same standards to retaliation claims arising under Title IX as they do to retaliation claims

---

[14] This determination moots Toth's argument concerning the Defendants' failure to articulate a legitimate, nondiscriminatory reason for not promoting her during the 2006/2007 promotion cycle.  Docket No. 72 at 1-4. Since the Defendants are entitled to summary judgment with respect to Toth's sex-based discrimination claims, it follows *a fortiori* that Toth's motion for partial summary judgment must be denied with respect to those claims. Docket No. 47 at ¶¶ 3-16.

arising under statutes such as Title VII and the PHRA.  *Dawn L. v. Greater Johnstown School District*, 586 F.Supp.2d 332, 373-374 (W.D.Pa. 2008).  Retaliation claims are analyzed in accordance with the *McDonnell Douglas-Burdine* burden-shifting framework.  *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 500-501 (3d Cir. 1997).

Toth alleges that the Defendants violated Title VII, Title IX and the PHRA by denying her promotion applications in retaliation for the filing of her charges of discrimination and the subsequent commencement of this action.[15]  Docket No. 10 at ¶¶ 75-81, 107-113, 137-142.  In order to establish a *prima facie* case of retaliation, Toth must demonstrate that: (1) she engaged in statutorily-protected conduct; (2) the Defendants took a "materially adverse" action (or a series of "materially adverse" actions) against her; and (3) there was a causal relationship between her statutorily-protected conduct and the Defendants' "materially adverse" action (or series of actions).  *Estate of Oliva v. Dept. of Law & Public Safety*, 604 F.3d 788, 798 (3d Cir. 2010).  An employee who files a charge of discrimination is entitled to statutory protection from retaliation only if he or she acts on the basis of an objectively reasonable belief that the conduct alleged in his or her charge actually constituted an illegal form of discrimination.  *Moore v. City of Philadelphia*, 461 F.3d 331, 341 (3d Cir. 2006)("Whether the employee opposes, or participates in a proceeding against, the employer's activity, the employee must hold an objectively reasonable belief, in good faith, that the activity they oppose is unlawful under Title VII.").  A retaliatory action is considered to be "materially adverse" to an employee if it might have dissuaded an objectively reasonable employee from filing or pursuing a charge of

---

[15] Although the first amended complaint contains references to Toth's opposition to discrimination allegedly perpetrated against other employees of the University, Toth now appears to base her retaliation claims solely on the Defendants' alleged reaction to the filing of her charges of discrimination and the commencement of this action. Docket No. 10 at ¶¶ 77, 109, 139; Docket No. 67 at 23-28.

discrimination. *Burlington Northern & Sante Fe Railway Co. v. White*, 548 U.S. 53, 67-71, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006).

Toth can easily demonstrate that Armenti's decisions denying her applications for promotion constituted "materially adverse" actions. *Id.* at 69 (remarking that an employer's act of "excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination"). The question of whether Toth had an objectively reasonable belief that she had been a victim of discriminatory conduct presents a closer call. No reasonable employee in Toth's position would have perceived her work environment to be hostile or abusive. *Clark County School District v. Breeden*, 532 U.S. 268, 269-271, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001)(*per curiam*). Nevertheless, it is unclear whether an objectively reasonable employee would have perceived Toth's remaining claims of discrimination to be meritorious. It is not necessary for Toth to establish that she was actually subjected to unlawful discrimination in order to proceed with her retaliation claims. *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1085 (3d Cir. 1996). It is sufficient for her to demonstrate that she filed her charges of discrimination in "good faith," and that she reasonably believed that the Defendants had denied her promotion applications on the basis of an unlawful criterion. *Griffiths v. CIGNA Corp.*, 988 F.2d 457, 468 (3d Cir. 1993).

Armenti testified that he had abruptly ended the meeting of July 20, 2007, after reading portions of Toth's "Plan B." Docket No. 51-6 at 19. He stated that he had viewed Toth's presentation of "Plan B" as a form of "extortion" designed to effectuate his approval of her promotion application in exchange for her promise not to make false allegations against him. *Id.* Armenti also denied that he had "stroked" Toth's hand. *Id.* at 23. Toth, of course, described the

meeting differently.  She testified that Armenti had verbally asked for her hand and touched it inappropriately while speaking with her.  Docket No. 51-1 at 22.  The differing accounts of the meeting put forth by Toth and Armenti were also included in Toth's charge of discrimination and the University's subsequent position statement.  Docket No. 51-5 at 29-30; Docket No. 70-7 at 26-27.

For purposes of the Defendants' motion for summary judgment, the Court must view the facts in the light most favorable to Toth.  *Watson*, 478 F.3d at 147.  Assuming *arguendo* that Armenti inappropriately "stroked" Toth's hand while speaking with her about her promotion prospects and referred to her as a "Pollock" on two prior occasions, a reasonable person in Toth's position might have believed herself to be a victim of discrimination based on her "sex" and "national origin."  Indeed, the Defendants appear to concede that the filing of Toth's charges of discrimination and the commencement of this action constituted statutorily-protected conduct. Docket No. 53 at 21.

The remaining question relevant to the *prima facie* inquiry is whether the record contains evidence suggesting that there was a causal relationship between Toth's protected activities and Armenti's decisions denying her applications for promotion.  *Estate of Oliva*, 604 F.3d at 798. Toth may rely on "a broad array of evidence" to establish this element of her *prima facie* case. *Farrell*, 206 F.3d at 283-284.  After a thorough review of the evidentiary record, the Court is convinced that Toth has presented sufficient evidence of causation to establish a *prima facie* case of retaliation.

The United States Court of Appeals for the Third Circuit has declared that where the "temporal proximity" between an employee's protected activity and an employer's materially adverse action is "unusually suggestive" of a retaliatory motive, it is sometimes sufficient to

"create an inference of causality" even in the absence of additional evidence.  *LeBoon v. Lancaster Jewish Community Center Association*, 503 F.3d 217, 232 (3d Cir. 2007).  The record indicates that Armenti made the decision to deny Toth's 2006/2007 promotion application on December 31, 2009.  Docket No. 51-5 at 58; Docket Nos. 68 & 75 at ¶ 189.  The instant action was commenced by Toth on December 24, 2009.  Docket No. 1.  Only one week passed between the filing of this lawsuit and Armenti's decision denying Toth's application.  Kane testified that Armenti had specifically referenced Toth's commencement of this action during the meeting conducted on January 25, 2010.  Docket No. 71-7 at 4.  Kane further stated that Armenti had been "upset" about Toth's allegations, and that his "body language" had been indicative of an individual who was "not at all comfortable."  *Id.* at 5, 13.  The fact that Armenti mentioned Toth's protected activity during the meeting could permit an inference of a retaliatory animus to be drawn.  *Fasold v. Justice*, 409 F.3d 178, 190 (3d Cir. 2005).  Hess testified that Armenti had refused to permit minutes to be taken during the meeting conducted on December 14, 2009.  Docket No. 71-8 at 13.  She stated that he had threatened to stop the meeting if someone were to start recording minutes.  *Id.*  Hanley testified that Armenti had been offended by Toth's allegations, and that he had talked about filing a defamation action against her.  Docket No. 71-11 at 5-6.  Furthermore, it is undisputed that Armenti became angry and quickly ended his July 20, 2007, meeting with Toth after reading portions of her "Plan B."  Docket No. 51-1 at 22; Docket No. 51-6 at 19.  It is also undisputed that Armenti sarcastically welcomed the filing of a lawsuit by saying that he would "look forward" to seeing Toth in court.  *Id.*  When this evidence is viewed in the light most favorable to Toth, it could give rise to an inference that Armenti's decisions denying Toth's promotion applications in December 2009 and January 2010 were motivated, at least in part, by a retaliatory animus.

In order to rebut Toth's *prima facie* case of retaliation, the Defendants "must clearly set forth, through the introduction of admissible evidence," their reasons for rejecting Toth's applications. *Burdine*, 450 U.S. at 255. When Armenti reviewed Toth's 2005/2006 application pursuant to Jaffe's order, he assigned numerical scores to Toth in three different areas. Docket No. 51-5 at 51. Armenti awarded Toth 21.5 out of 38 possible points in the area of "effective teaching and fulfillment of professional responsibilities," 9.5 out of 21 possible points in the area of "continued scholarly growth," and 8 out of 21 possible points in the area of "service." *Id.* This left Toth with an overall score of 39, which was 11 points below the minimum score of 50 needed to obtain a promotion to the position of Full Professor. *Id.* When Armenti reviewed Toth's 2006/2007 application, he awarded her 22.5 out of 38 possible points in the area of "effective teaching and fulfillment of professional responsibilities," 9 out of 21 possible points in the area of "continued scholarly growth," and 8.5 out of 21 possible points in the area of "service." *Id.* This left Toth with an overall score of 40, which was 10 points below the minimum score of 50 that she needed to secure a promotion. *Id.* The Court also notes that Jaffe's order specifically permitted Armenti to consider Tuennerman-Kaplan's opinion in determining whether Toth should be promoted. Docket No. 51-4 at 54. Tuennerman-Kaplan had previously expressed "some concerns" about the breadth of Toth's "involvement in the areas of scholarship and contributions to the University and/or Community."[16] Docket No. 51-5 at 2. In his supplemental decision of April 22, 2011, Jaffe determined that Armenti had complied with the prior order of July 20, 2009, and all applicable provisions of the CBA. Docket No. 51-16 at 24.

---

[16] Toth takes issue with a detailed score sheet completed by Tuennerman-Kaplan in connection with the 2006/2007 promotion application. Docket No. 67 at 12-15. The Court focuses on the scores derived by Armenti because they are more relevant to Toth's retaliation claims.

The evidence presented by the Defendants, if believed by a jury, would be "legally sufficient" to justify a judgment in their favor. *Burdine*, 450 U.S. at 255. In order to defeat the Defendants' motion for summary judgment, Toth must either discredit their proffered reasons for denying her promotion applications or demonstrate that a retaliatory animus was "more likely than not a motivating or determinative cause" of the challenged denials. *Fuentes*, 32 F.3d at 764. In certain instances, a plaintiff's *prima facie* case, when combined with evidence suggesting that an employer's proffered reason for an adverse employment action is false, may enable a reasonable trier of fact to conclude that unlawful discrimination has occurred. *Reeves*, 530 U.S. at 146-149.

Although a plaintiff cannot establish the existence of discrimination or retaliation merely by showing that a materially adverse action has been taken on the basis of "highly subjective" criteria, an employer cannot immunize such an action from legal scrutiny by "cloaking such criteria with an appearance of objectivity." *Goosby v. Johnson & Johnson Medical, Inc.*, 228 F.3d 313, 321 (3d Cir. 2000). Armenti acknowledged during his deposition that the scores assigned to Toth in connection with her promotion applications had been highly "subjective," and that they had not been arrived at "quantitatively." Docket No. 51-6 at 41. It is undisputed that the UWPC had previously assigned Toth overall scores of 57.78 and 56.5. Docket No. 51-3 at 43; Docket No. 70-7 at 16. The fact that Armenti subjectively assigned Toth much lower scores of 39 and 40, when coupled with Toth's *prima facie* case of retaliation, could enable a reasonable jury to conclude that Armenti's decisions denying the applications were attributable to Toth's protected activities rather than to an honest evaluation of her qualifications. *Doe*, 527 F.3d at 370 (explaining that "evidence supporting the *prima facie* case is often helpful at the pretext stage"). A genuine issue of material fact exists as to whether Armenti denied Toth's

48

promotion applications in retaliation for her statutorily-protected activities.  Accordingly, the

Court will deny the Defendants' motion for summary judgment with respect to Toth's retaliation

claims under Title VII and Title IX.  Docket No. 10 at ¶¶ 75-81, 137-142.

The fact that Toth can defeat the Defendants' motion for summary judgment with respect

to her retaliation claims does not mean that she is entitled to a judgment in her favor.  As

discussed earlier, Armenti perceived Toth's "Plan B," and the allegations contained therein, as an

attempt to "extort" a promotion out of him.  Docket No. 51-6 at 19.  The statutory provisions

invoked by Toth do not provide her with a license to place the University's officials in "a judicial

straight-jacket not contemplated by Congress."  *Curay-Cramer v. Ursuline Academy of*

*Wilmington, Delaware, Inc.*, 450 F.3d 130, 137 (3d Cir. 2006).  She cannot prevail at trial simply

by convincing the trier of fact that the Defendants' proffered reasons for denying her applications

are false.  *Reeves*, 530 U.S. at 146 (declaring that "the factfinder's rejection of the employer's

legitimate, nondiscriminatory reason for its action does not *compel* judgment for the

plaintiff")(emphasis in original).  Instead, she must persuade the jury that her statutorily-

protected activities actually motivated Armenti's decisions denying her applications.  *Id.*

(explaining that "[t]he ultimate question is whether the employer intentionally discriminated").

Toth moves for partial summary judgment on the theory that Armenti "retaliated" against

her by divulging her allegations to others and accusing her of "extortion."  Docket No. 48 at 8-

13.  Armenti testified that he had discussed the allegations contained in Toth's charge of

discrimination with "almost anyone who would listen."  Docket No. 51-6 at 20.  Toth, in turn,

responds that Title VII's confidentiality provisions prohibited Armenti from discussing the

contents of her EEOC charge with others.  Docket No. 48 at 10.  This argument is completely

nonsensical.  The statutory provisions relied upon by Toth apply only to employees of the

EEOC.  42 U.S.C. §§ 2000e-5(b), 2000e-8(e).  They do not prohibit covered employers from publicly refuting allegations lodged against them.  Moreover, an employer's practice of divulging the allegations contained in charges of discrimination would not deter an objectively reasonable employee from filing an EEOC charge.  *Burlington Northern*, 548 U.S. at 67-71.  Since complainants frequently file charges of discrimination for the purpose of exhausting the administrative prerequisites to commencing actions under Title VII, it is reasonable to assume that many complainants *expect* their allegations to be made public sooner or later.  Toth's motion for partial summary judgment will be denied.  Docket No. 47.

The only remaining issue relevant to Toth's retaliation claims concerns the potential liability of Armenti and Madden under the PHRA.  Docket No. 10 at ¶¶ 107-113.  Toth attempts to hold both individuals liable under 43 PA. STAT. § 955(e), which applies to both employers and employees.  *Nolan v. Vaughn, Duffy & Connors, LLP*, 542 F.Supp.2d 429, 432 (E.D.Pa. 2008).  Relying on *Dici v. Commonwealth of Pennsylvania*, 91 F.3d 542, 552-553 (3d Cir. 1996), the Defendants argue that individual liability under § 955(e) does not extend to "direct incidents of wrongdoing."  Docket No. 53 at 25, n. 13.  They contend that an individual may be held liable only for "aiding" or "abetting" a distinct act of discrimination.  *Id.*  This argument is not consistent with the plain language of the statute, which makes it unlawful for any "person" or "employee" "to attempt, *directly* or indirectly, to *commit any act* declared . . . to be an unlawful discriminatory practice."  43 PA. STAT. § 955(e).  The language in *Dici* relied upon by the Defendants stands for the proposition that individual liability under § 955(e) can extend only to an employee who shares "the discriminatory purpose and intent" of the offending employer.  *Holocheck v. Luzerne County Head Start, Inc.*, 385 F.Supp.2d 491, 497 (M.D.Pa. 2005).  The reasoning employed in *Dici* does not preclude the imposition of individual liability upon

supervisory employees who implement unlawful acts of discrimination.  *O'Donnell v. Pennsylvania Dept. of Corrections*, 790 F.Supp.2d 289, 309 (M.D.Pa. 2011)("Furthermore, an individual may be liable under § 955(e) either as a result of his own discriminatory conduct, or for 'refusing to take prompt and remedial action against any discrimination suffered by' an employee."), quoting *Dici*, 91 F.3d at 552-553.

The Defendants correctly point out that Madden did not take any actions in relation to Toth subsequent to the protected activities which form the basis of her retaliation claims.  Docket No. 53 at 25-26.  Therefore, the retaliation claims asserted against Madden must be dismissed. Docket No. 10 at ¶¶ 107-113.  Since a genuine issue of material fact exists as to whether Armenti retaliated against Toth by denying her applications for promotion in December 2009 and January 2010, the Defendants' motion for summary judgment will be denied with respect to the retaliation claims asserted against Armenti.  *Id.*

## D.    The First Amendment Claims

Toth alleges that the Defendants violated her rights under the First and Fourteenth Amendments by denying her promotion applications in retaliation for her speech and petitioning activities.  Docket No. 10 at ¶¶ 114-126.  She brings her constitutional claims pursuant to 42 U.S.C. § 1983, which provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ."  42 U.S.C. § 1983.  This statutory provision does not create substantive rights.  *Maher v. Gagne*, 448 U.S. 122, 129, n. 11, 100 S.Ct. 2570, 65 L.Ed.2d 653

(1980).  A plaintiff cannot obtain redress under § 1983 without establishing an underlying

violation of a federal constitutional or statutory right.  *City of Rancho Palos Verdes v. Abrams*,

544 U.S. 113, 119-120, 125 S.Ct. 1453, 161 L.Ed.2d 316 (2005).

      The first step in the Court's analysis is to "identify the exact contours of the underlying

right[s] said to have been violated."  *County of Sacramento v. Lewis*, 523 U.S. 833, 841, n. 5,

118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998).  The First Amendment provides:

> Congress shall make no law respecting an establishment of religion, or prohibiting
> the free exercise thereof; or abridging the freedom of speech, or of the press, or of
> the right of the people peaceably to assemble, and to petition the Government for
> a redress of grievances.

U.S. CONST., AMEND. I.  Toth's claims arise under the Free Speech and Petition Clauses.  Docket

No. 10 at ¶ 119.  These provisions are applicable to the States by virtue of the Due Process

Clause of the Fourteenth Amendment.  *United Brotherhood of Carpenters & Joiners of America

v. Scott*, 463 U.S. 825, 831, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983).

      **1.**      **The Constitutional Claims Against the University**

      Before proceeding to the merits of Toth's First Amendment claims, the Court must

address some preliminary matters.  The Eleventh Amendment provides that "[t]he judicial power

of the United States shall not be construed to extend to any suit in law or equity, commenced or

prosecuted against one of the United States by Citizens of another State, or by Citizens or

Subjects of any Foreign State."  U.S. CONST., AMEND. XI.  The Supreme Court has construed

this narrow language "to stand not so much for what it says, but for the presupposition of our

constitutional structure which it confirms."  *Blatchford v. Native Village of Noatak*, 501 U.S.

775, 779, 111 S.Ct. 2578, 115 L.Ed.2d 686 (1991).  "This presupposition is based on the

understanding that 'the States entered the federal system with their sovereignty intact,' that '[t]he

Judicial power of the United States' is limited by this sovereignty, and that a State will not be subjected to suits in federal court brought by private individuals unless it has consented to such suits either expressly or in the 'plan of the convention.'" *Burns v. Alexander*, 776 F.Supp.2d 57, 72 (W.D.Pa. 2011)(brackets in original), quoting *Blatchford*, 501 U.S. at 779.  Pennsylvania has not waived its immunity from suit in federal court.  42 PA. CONS. STAT. § 8521(b).

The University is a part of the System.  24 PA. STAT. § 20-2002-A(a)(2).  As a part of the System, the University is immune from suit in federal court.  *Skehan v. State System of Higher Education*, 815 F.2d 244, 247-249 (3d Cir. 1987)(holding that the System was entitled to Eleventh Amendment immunity); *O'Hara v. Indiana University of Pennsylvania*, 171 F.Supp.2d 490, 495-498 (W.D.Pa. 2001)(holding that one of the System's "fourteen component universities" enjoyed Eleventh Amendment immunity).  When Congress validly acts pursuant to its "power to enforce"[17] the substantive provisions of the Fourteenth Amendment, it may "provide for private suits against States or state officials which are constitutionally impermissible in other contexts."  *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976).  Congress has abrogated the States' Eleventh Amendment immunity in actions brought under Title VII and Title IX.  42 U.S.C. §§ 2000d-7(a), 2000e(a), (f); *Franklin*, 503 U.S. at 72; *Fitzpatrick*, 427 U.S. at 453-457.  For this reason, Toth's Title VII and Title IX claims are not barred by the Eleventh Amendment.  Unlike Title VII and Title IX, § 1983 has not been construed as an abrogation of the States' Eleventh Amendment immunity.  *Quern v. Jordan*, 440 U.S. 332, 342-345, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979).  In this vein, the Supreme Court has determined that the States are not "persons" subject to suit under § 1983.  *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 62-71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989).  Consequently, Toth's First Amendment claims against the University must be dismissed.  The Court will grant

---

[17] U.S. CONST., AMEND. XIV, § 5.

the Defendants' motion for summary judgment with respect to those claims.  Docket No. 10 at ¶¶ 114-126.

### 2.     The Constitutional Claims Against Madden

Certain principles of state law are applicable to actions brought under § 1983 in situations where "the laws of the United States . . . are deficient in the provisions necessary to furnish suitable remedies . . . ."  42 U.S.C. § 1988(a).  The Supreme Court has explained that when an individual commences an action under § 1983, the forum State's "statute of limitations" and "coordinate tolling rules" should be regarded as "binding rules of law."  *Board of Regents v. Tomanio*, 446 U.S. 478, 484, 100 S.Ct. 1790, 64 L.Ed.2d 440 (1980).  The statute of limitations applicable to actions brought under § 1983 is the statute of limitations applicable under state law to actions seeking "the recovery of damages for personal injuries."  *Wilson v. Garcia*, 471 U.S. 261, 276, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985).  In Pennsylvania, the limitations period applicable to personal-injury actions is two years.  42 PA. CONS. STAT. § 5524(2), (7); *Smith v. City of Pittsburgh*, 764 F.2d 188, 194 (3d Cir. 1985).

In his memorandum of July 10, 2007, Madden did not recommend that Toth be promoted.  Docket No. 70-7 at 18.  The memorandum was sent a little more than two months after Madden took issue with the contents of the newsletter published by California's chapter of the APSCUF.  Docket No. 51-4 at 60.  Toth suggests that Madden's decision not to recommend her for promotion constituted retaliation for the statements that she had made in the newsletter.  Docket No. 67 at 29.  The instant action, however, was not commenced until December 24, 2009. Docket No. 1.  Any constitutional claim that Toth may have had against Madden stemming from his memorandum would have accrued when the memorandum was sent to Armenti.  *O'Connor v. City of Newark*, 440 F.3d 125, 127-128 (3d Cir. 2006); *Suppan v.*

54

*Dadonna*, 203 F.3d 228, 234-235 (3d Cir. 2000).  Since more than two years elapsed between the date of the memorandum and the commencement of this action, Toth's First Amendment claims against Madden are time-barred.

In the stipulation signed by the parties on May 25, 2011, Toth clarified that her First Amendment claims pertain only to the denials of her promotion applications in December 2009 and January 2010.  Docket No. 36 at ¶ 4(b).  Madden played no role in that reconsideration process.  Indeed, Jaffe's order of July 20, 2009, specifically prohibited Armenti from considering Madden's opinion in determining whether Toth should be promoted.  Docket No. 51-4 at 54.  Therefore, Toth cannot proceed with her First Amendment claims against Madden.  The Defendants' motion for summary judgment will be granted with respect to those claims.  Docket No. 10 at ¶¶ 114-126.

### 3.    The Constitutional Claims Against Armenti

It was once unchallenged dogma that the Constitution did not provide a public employee with a basis for objecting to the terms or conditions of his or her employment, even where such terms or conditions restricted the exercise of constitutional rights.  *Adler v. Board of Education*, 342 U.S. 485, 492, 72 S.Ct. 380, 96 L.Ed. 517 (1952).  In recent times, however, the Supreme Court has declared that "a State cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression."  *Connick v. Myers*, 461 U.S. 138, 142, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).  The test used to determine whether a public employer has transgressed this proscription can be traced to *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), in which the Supreme Court explained:

"The theory that public employment which may be denied altogether may be subject to any conditions, regardless of how unreasonable, has been uniformly

rejected." *Keyishian v. Board of Regents*, [385 U.S. 589, 605-606, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967)].  At the same time it cannot be gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general.  The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.

*Pickering*, 391 U.S. at 568.  The language used in *Pickering* describes the framework that must be employed in determining whether the First Amendment prohibits a public employer from retaliating against an employee because of his or her speech.

Decisions rendered subsequent to *Pickering* illustrate that the precise language used in that decision must be taken seriously.  For expression to enjoy the particular form of constitutional protection provided under *Pickering*, it must come from a public employee who is speaking "as a citizen."  *Id.*  In *Garcetti v. Ceballos*, 547 U.S. 410, 421, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006), the Supreme Court held that public employees "are not speaking as citizens for First Amendment purposes" when they "make statements pursuant to their official duties."  The rule established in *Garcetti* reflects a public employer's prerogative to control "what the employer itself has commissioned or created."  *Garcetti*, 547 U.S. at 422.  In *Connick v. Myers*, 461 U.S. 138, 147, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), the Supreme Court held that the Free Speech Clause does not prevent a public employer from taking disciplinary action against an employee who speaks about matters of only "personal interest."  The decision in *Connick* gives effect to the language in *Pickering* referring to a public employee's interest in "commenting upon matters of public concern."  *Pickering*, 391 U.S. at 568.

Where a public employee speaks "as a citizen" about "matters of public concern" and is disciplined in retaliation for that speech, "the possibility of a First Amendment claim arises."

56

*Garcetti*, 547 U.S. at 418.  In that situation, the legality of the disciplinary action generally turns on "whether the relevant government entity ha[s] an adequate justification for treating the employee differently from any other member of the general public," whether the employee's speech "has some potential to affect the entity's operations," and whether the concomitant restrictions on speech are necessary to the entity's efficient and effective operation.  *Id.* at 418-419.  Consideration may also be given to whether the speech "impairs discipline by superiors or harmony among co-workers," "has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary," "impedes the performance of the speaker's duties," or "interferes with the regular operation of the enterprise." *Rankin v. McPherson*, 483 U.S. 378, 388, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987).  Where a public employee speaks not "as a citizen," but rather pursuant to his or her official duties, "the Constitution does not insulate [his or her] communications from employer discipline." *Garcetti*, 547 U.S. at 421.  Similarly, where a public employee's speech does not involve a matter of public concern, the First Amendment does not prevent his or her employer from taking retaliatory action in response to that speech. *City of San Diego v. Roe*, 543 U.S. 77, 82-83, 125 S.Ct. 521, 160 L.Ed.2d 410 (2004)(explaining that "a public employee's speech must touch on a matter of 'public concern'" in order to "merit *Pickering* balancing").

In *Borough of Duryea v. Guarnieri*, ___U.S. ___, ___, 131 S.Ct. 2488, 2495- 2501, 180 L.Ed.2d 408 (2011), the Supreme Court extended the rule established in *Connick* to claims arising under the Petition Clause.  Speaking through Justice Kennedy, the Supreme Court explained:

> The framework used to govern Speech Clause claims by public employees, when applied to the Petition Clause, will protect both the interests of the government and the First Amendment right.  If a public employee petitions as an employee on a matter of purely private concern, the employee's First Amendment interest must

> give way, as it does in speech cases. *Roe*, 543 U.S., at 82-83, 125 S.Ct. 521, 160
> L.Ed.2d 410.  When a public employee petitions as a citizen on a matter of public
> concern, the employee's First Amendment interest must be balanced against the
> countervailing interest of the government in the effective and efficient
> management of its internal affairs. *Pickering*, *supra*, at 568, 88 S.Ct. 1731, 20
> L.Ed.2d 811.  If that balance favors the public employee, the employee's First
> Amendment claim will be sustained.  If the interference with the government's
> operations is such that the balance favors the employer, the employee's First
> Amendment claim will fail even though the petition is on a matter of public
> concern.

*Guarnieri*, 131 S.Ct. at 2500.  The Supreme Court concluded its analysis by admonishing that

the Petition Clause does not provide public employees with "a right to transform everyday

employment disputes into matters for constitutional litigation in the federal courts."  *Id.* at 2501.

A plaintiff seeking to prevail in a case governed by *Pickering* must establish the existence

of a causal relationship between his or her speech and the challenged employment action.

*Stephens v. Kerrigan*, 122 F.3d 171, 180 (3d Cir. 1997).  In *Mt. Healthy City School District*

*Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), the Supreme

Court made the following observations about the issue of causation in the First Amendment

context:

> A borderline or marginal candidate should not have the employment question
> resolved against him because of constitutionally protected conduct.  But that same
> candidate ought not to be able, by engaging in such conduct, to prevent his
> employer from assessing his performance record and reaching a decision not to
> rehire on the basis of that record, simply because the protected conduct makes the
> employer more certain of the correctness of its decision.

*Doyle*, 429 U.S. at 286.  Under *Doyle*, a plaintiff asserting a First Amendment retaliation claim

bears the initial burden of demonstrating that his or her speech was a "substantial" or

"motivating" factor behind the employment action at issue.  *Id.* at 287.  If such a showing is

made, the burden shifts to the defendant to prove, by a preponderance of the evidence, that it

would have taken the same action in the absence of the employee's speech.  *Id.*  The issue of causation presents a question of fact.  *Baldassare v. New Jersey*, 250 F.3d 188, 195 (3d Cir. 2001).

In an attempt to establish that she engaged in activities entitled to constitutional protection, Toth relies on the grievances that she filed pursuant to the terms of the CBA.  Docket No. 10 at ¶ 121; Docket No. 67 at 28-29.  Those grievances, however, cannot provide a predicate for Toth's First Amendment claims.  Constitutional protection does not extend to grievances pertaining only to matters such as "working conditions, pay, discipline, promotions, leave, vacations, and terminations."  *Guarnieri*, 131 S.Ct. at 2496.  Toth's grievances were not designed "to advance political, social, or other ideas of interest to the community as a whole." *Id.* at 2498.  Instead, they were designed solely to facilitate her promotion to the position of Full Professor of Psychology.  Since the grievances did not relate to a matter of public concern, they provide no support for Toth's claims under the Petition Clause.  *Id.* at 2500.

The record indicates that, in August 2006, Toth delivered a controversial speech to members of the University's faculty and administration.  Docket No. 67 at 29; Docket No. 74 at 4.  She apparently concluded the speech with a "union solidarity salute."  Docket No. 67 at 29. Hanley testified that Armenti had responded by accusing Toth of "vomiting on the living room floor when there [was] company present."  Docket No. 71-11 at 4.  During the spring of 2007, Toth prepared the University's faculty for a strike and appeared on the front page of a local newspaper.  Docket No. 70-4 at ¶ 24.  The APSCUF's newsletter with the cartoon lampooning the System's administration and management was published in March 2007.  Docket No. 70-9 at 36-38.  Toth posits that her involvement in these activities motivated Armenti's decision to deny her promotion applications.  Docket No. 67 at 29.

Marita Gaddis ("Gaddis") worked as a stenographer for the University from 1978 through 2000. Docket No. 71-13 at ¶ 2. She also served as the President of a union known as the "American Federation of State, County, and Municipal Employees." *Id.* at ¶ 3. In a declaration dated August 16, 2011, Gaddis stated that Armenti had told her that he wanted to "break the unions" at the University, and that he had threatened to retaliate against her for her "union activities." *Id.* at ¶¶ 5, 7. She claimed that the University had terminated her employment in 2000 after she had asked for a "reasonable accommodation" pertaining to "a serious migraine headache disorder." *Id.* at ¶¶ 9-10. The decision to discharge Gaddis was apparently made by Allan Golden ("Golden"), the University's Vice-President for Administration and Finance, who was acting as Armenti's "designated representative." *Id.* at ¶¶ 4, 12. Gaddis declared that Armenti and Golden had terminated her employment with the University in retaliation for her "union activities." *Id.* at ¶ 13. Toth relies on Gaddis' declaration in an attempt to demonstrate that Armenti decided not to promote her because of her involvement with the APSCUF's activities. Docket No. 67 at 29-30.

"Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147-148. Speech cannot be deemed to involve matters of public concern simply because it relates to union-related matters. *Davignon v. Hodgson*, 524 F.3d 91, 101 (1st Cir. 2008). Indeed, unions frequently deal with "everyday employment disputes," which are not "matters for constitutional litigation in the federal courts." *Guarnieri*, 131 S.Ct. at 2501. In the APSCUF's newsletter, Toth complained that Hample had responded to increased class sizes throughout the System's fourteen universities by increasing the hiring and pay of management personnel rather than by increasing the hiring and pay of faculty members. Docket No. 70-9 at

36-38.  Statements relating to the allocation of government resources often involve matters of

public concern.  *Pickering*, 391 U.S. at 571-572.  Therefore, the Court assumes *arguendo* that

Toth's statements in the newsletter were sufficiently related to matters of public concern to

warrant balancing under *Pickering*.  *Roe*, 543 U.S. at 82-83.  The extent to which Toth's

statements or activities concerning the impending strike were protected cannot be easily

determined, since the exact content of her speech is not contained in the record.  Under the

present circumstances, that issue need not be confronted.  On the basis of the existing record,

Toth cannot establish that her union-related speech was a "substantial" or "motivating" factor

behind Armenti's decisions denying her applications for promotion in December 2009 and

January 2010.  *Doyle*, 429 U.S. at 287.

The anti-union statements attributed to Armenti by Gaddis were allegedly made several

years before Armenti reconsidered Toth's applications pursuant to Jaffe's order.  Although

Madden took exception to the content of the newsletter in his message of March 3, 2007, Toth

points to nothing in the record which suggests that Armenti was similarly offended by either her

statements in the newsletter or the cartoon lampooning the System's administrators.  Docket No.

51-4 at 60.  More than two and a half years passed between the spring of 2007 and the promotion

denials presently at issue.  Toth has stipulated that the initial denials of her promotion

applications do not form the basis of her First Amendment claims.  Docket No. 36 at ¶ 4(b).  As

noted earlier, any First Amendment claims stemming from those denials would have accrued

more than two years prior to the commencement of this action.  *O'Connor*, 440 F.3d at 127-128;

*Suppan*, 203 F.3d at 234-235.

In order to establish an actionable violation of the First Amendment, Toth must

demonstrate that her expressive activities in August 2006 and the spring of 2007 motivated

61

Armenti's decisions denying her promotion applications in December 2009 and January 2010.

She cannot make this showing simply by relying on stale evidence of Armenti's alleged anti-

union bias and asking a jury to speculate about his motives for denying her applications.

Speaking about the causation requirements applicable to First Amendment retaliation claims in

*Lauren W. v. DeFlaminis*, 480 F.3d 259 (3d Cir. 2007), the United States Court of Appeals for

the Third Circuit explained:

> A court must be diligent in enforcing these causation requirements because
> otherwise a public actor cognizant of the possibility that litigation might be filed
> against him, particularly in his individual capacity, could be chilled from taking
> action that he deemed appropriate and, in fact, was appropriate.  Consequently, a
> putative plaintiff by engaging in protected activity might be able to insulate
> himself from actions adverse to him that a public actor should take.  The point we
> make is not theoretical as we do not doubt that public actors are well aware that
> persons disappointed with official decisions and actions frequently bring litigation
> against the actors responsible for the decisions or actions in their individual
> capacities, and the actors surely would want to avoid such unpleasant events.
> Thus, it would be natural for a public actor to attempt to head off a putative
> plaintiff with the unwarranted expenditure of public funds.  Courts by their
> decisions should not encourage such activity and, by enforcing the requirement
> that a plaintiff show causation in a retaliation case, can avoid doing so as they will
> protect the public actor from unjustified litigation for his appropriate conduct.  In
> this regard we recognize that often public actors such as those in this case must
> make a large number of decisions in charged atmospheres thereby inviting
> litigation against themselves in which plaintiffs ask the courts to second guess the
> actors' decisions.

*Lauren W.*, 480 F.3d at 267-268.  Given that the evidence presented by Toth concerning

Armenti's anti-union bias is mostly outdated and lacking in probative value, Armenti is entitled

to summary judgment with respect to the First Amendment claims asserted against him.[18]

Docket No. 10 at ¶¶ 114-126.

---

[18] The Court has no occasion to consider whether the filing of Toth's charges of discrimination and the
commencement of this action constituted petitioning activities entitled to First Amendment protection.  When they
initially moved for summary judgment, the Defendants implicitly acknowledged that these activities involved
matters of public concern under *Azzaro v. County of Allegheny*, 110 F.3d 968, 978 (3d Cir. 1997).  Docket No. 53 at
30.  Nonetheless, the only formal petitions relied upon by Toth in support of her First Amendment claims are the

## V.    <u>Conclusion</u>

Toth's motion for partial summary judgment (*Docket No. 47*) will be denied.  The

Defendants' motion for summary judgment (*Docket No. 49*) will be granted with respect to

Toth's *quid pro quo*, "hostile work environment," trait-based discrimination, Rehabilitation Act

and First Amendment claims.  Docket No. 10 at ¶¶ 50-74, 82-106, 114-136, 143-148.  The

Defendants' motion for summary judgment will be denied with respect to Toth's retaliation

claims against the University under Title VII and Title IX.  *Id.* at ¶¶ 75-81, 137-142.  With

respect to Toth's retaliation claims under the PHRA, the Defendants' motion for summary

judgment will be granted as to Madden and denied as to Armenti.  *Id.* at ¶¶ 107-113.  Madden

will be dismissed as a defendant in this action, and the caption will be amended accordingly.

By the Court:


*s/Nora Barry Fischer*
Nora Barry Fischer
United States District Judge


Date:   January 9, 2012

cc:     All counsel of record

---

grievances filed pursuant to the CBA.  Docket No. 10 at ¶ 121.  Her filings with the EEOC and the PHRC are mentioned only in the portions of the first amended complaint pertaining to her statutory retaliation claims.  *Id.* at ¶¶ 76, 108, 138.  A determination as to whether Toth enjoyed constitutional protection from retaliation for filing charges of discrimination and commencing this action would require the Court to weigh her interest in speaking or petitioning against the University's countervailing interest in ensuring "the effective and efficient management of its internal affairs."  *Borough of Duryea v. Guarnieri*, ___U.S.___, ___, 131 S.Ct. 2488, 2500, 180 L.Ed.2d 408 (2011).  There is no need for the Court to conduct this analysis, since Toth does not rely on the filing of her charges of discrimination and the commencement of this action as predicates for her constitutional claims.  Docket No. 10 at ¶¶ 114-126.